IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DE'KELVIN RAFAEL MARTIN,            )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        Civil Action No. _____
                                    )
GREGORY DOZIER, Commissioner,       )
        Georgia Department of Corrections, )
                                    )
BENJAMIN FORD, Warden,              )
        Georgia Diagnostic and      )
        Classification Prison,      )
                                    )
        Defendants.                 )
_____    )

## COMPLAINT

Defendants plan to execute Plaintiff De'Kelvin Rafael Martin pursuant to a

lethal injection protocol that lacks adequate safeguards to ensure proper

administration of the drugs.  The clear and demonstrable problems with past

executions demonstrate that a significant likelihood of maladministration poses a

substantial and unacceptable risk that Mr. Martin will suffer an excruciating death.

Defendants' protocol[1] calls for the intravenous injection of five (5) grams of

pentobarbital, a method that, if implemented properly, would result in a

_____

[1] *See* Georgia Department of Corrections, Georgia Diagnostic and
Classification Prison Lethal Injection Procedures (Ex. 1).

constitutionally compliant execution. As Defendants' own records establish,[2] however, the executions conducted pursuant to this protocol have resulted in wildly disparate times of death, a phenomenon that can only be explained by systematic maladministration and error. Autopsies of the prisoners executed subject to this protocol establish the risk of harm that Defendants' maladministration creates: Mr. Martin will experience fulminant pulmonary edema, the extreme accumulation of fluid in the lungs—characteristic of a death resulting from a Sarin gas attack or drowning—and will suffer excruciating pain as he dies. Defendants' protocol, which lacks adequate safeguards to ensure proper administration and is arbitrarily and inconsistently applied, presents a substantial risk of torturous suffering and violates Mr. Martin's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

These failures are a feature, not a bug. Defendants have a long and sordid history of malfeasance and incompetence when implementing their executions by lethal injection. In 2011, the Drug Enforcement Administration seized Defendants' stockpile of lethal injection drugs after discovering that they had circumvented federal law governing the importation of controlled substances by purchasing "misbranded and unapproved" sodium thiopental "prepared in an

---

[2] *See* Executions Under Defendants' Current Lethal Injection Protocol (Ex. 2).

unregistered establishment" directly from Dream Pharma, Inc., a pharmaceutical distributor operating out of the back office of a storefront driving school in London, England. *Cook v. Food & Drug Admin.*, 733 F.3d 1, 12 (D.C. Cir. 2013).[3] After changing their protocol to feature pentobarbital, Defendants executed Roy Blankenship who, "[a]s the injection began . . . jerked his head toward his left arm and made a startled face while blinking rapidly. . . . [,] lurched to his right arm, lunging with his mouth agape twice . . . . his chin smack[ing] as he mouthed words that were inaudible to observers . . . . His eyes never closed."[4] In 2012, Defendants changed from a three-drug to a one-drug protocol on the eve of an execution because one of the drugs they needed had expired two weeks earlier, well before the execution order was entered.[5] In 2013, Defendants scheduled two executions

---

[3]*See also* Bill Rankin et al., *DEA seizes Georgia's supply of lethal injection drug*, ATLANTA JOURNAL-CONSTITUTION (March 16, 2011), available at http://www.ajc.com/news/news/local/dea-seizes-georgias-supply-of-lethal-injection-dru/nQrdf/ (last visited Oct. 1, 2018).

[4] Greg Bluestein, *Ga. Executes inmate convicted of Savannah slaying*, ATLANTA JOURNAL-CONSTITUTION (June 23, 2011); *see also* Eddie Ledbetter, *Making a date with death*, STATESBORO HERALD (June 25, 2011) ("Blankenship was apparently much more aware of his surroundings at a time when he shouldn't have been"). Plaintiff notes that as the failures detailed in this complaint could be attributed to problems with Defendants' equipment and personnel, Mr. Blankenship's botched execution constitutes evidence of such a problem.

[5] *State changes lethal injection protocol, reschedules execution*, ATLANTA JOURNAL-CONSTITUTION (July 17, 2012), available at: http://www.ajc.com/news/news/local/state-changes-lethal-injection-protocol-

3

just two-days apart because they mistakenly believed that their drugs were set to expire.[6]

Following these heavily-scrutinized irregularities and missteps, the Georgia Legislature adopted a lethal injection secrecy act, O.C.G.A. § 42-5-36(d), which classifies all "identifying information" about a "person or entity who participates in or administers the execution of a death sentence . . . [or] that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment" used in an execution as a "confidential state secret" not subject to disclosure through Georgia's Open Records Act or "*judicial process*."  O.C.G.A. § 42-5-36(d) (emphasis added).  The purpose of this legislation—which went into effect on July 1, 2013—was to shield Defendants and their pharmacies, doctors, and personnel from all scrutiny and oversight, judicial or otherwise.

---

reschedule/nQXJc/ (last visited Oct. 1, 2018); Rhonda Cook, *Expired drugs led to cancellation of execution by lethal injection*, ATLANTA JOURNAL-CONSTITUTION (Aug. 2, 2012), available at: http://www.ajc.com/news/news/local/expired-drugs-led-to-cancellation-of-execution-by-/nQXhn/ (last visited Oct. 1, 2018).

[6] Defendants believed their supply of pentobarbital expired on March 1, 2013; it actually expired on March 31.  Ed Pilkington, *Georgia rushes through executions before lethal injection drugs expire*, THE GUARDIAN (February 21, 2013) ("Georgia confirmed to the Guardian that its entire supply of pentobarbital expires on 1 March"), available at: http://www.guardian.co.uk/world/2013/feb/21/georgia-executions-lethal-injection-drug-pentobarbital (last visited Oct. 1, 2018).

Defendants' troubles persisted.  On March 2, 2015, they were forced to cancel that night's scheduled execution of Kelly Gissendaner after discovering that both batches of their lethal injection drugs were "cloudy" and not "appropriate for medical use."  Defendants claimed that the drugs had congealed because they had been stored at too cold of a temperature, although the testing that they subsequently conducted belied that conclusion.  *Gissendaner v. Bryson (Gissendaner II)*, Case No. 1:15-cv-00689 (Doc. No. 17).  Most recently, on May 4, 2018, Robert Earl Butts, after being injected with compounded pentobarbital, groaned that the drugs "burn[ed]."[7]

Despite the evidence detailed above, Defendants' longstanding failure to consistently and properly implement their lethal injection protocol has heretofore evaded judicial review.  Prior litigation, arising under the shadow of pending execution dates, has been rushed, and discovery has been, necessarily, limited.  Mr. Martin, however, is not under the threat of imminent execution.  This is no eleventh-hour tactic to delay the inevitable.  Rather, Mr. Martin has identified significant and weighty issues—whether Defendants' current lethal injection protocol and their persistent maladministration of such protocol violates the Eighth

---

[7] Rhonda Cook, *Robert Butts executed for 1996 murder. Final words: 'It burns, man',* ATLANTA JOURNAL-CONSTITUTION (May 4, 2018) (available at https://www.ajc.com/news/crime--law/georgia-supreme-court-rejects-stay-execution-for-robert-earl-butts/dip94hP3OKhskZ32Dw6Q5M/ (last visited Oct. 1, 2018).

5

and Fourteenth Amendments—deserving of a full hearing on the merits without the constraints of an impending execution.

In *Baze v. Rees*, the United States Supreme Court made clear that "the risk of pain from maladministration of a concededly humane lethal injection protocol" could "constitute cruel and unusual punishment." 553 U.S. 35, 41 (2008). The Court held, however, that an "isolated mishap" or the allegation that "the protocol's terms might not be properly followed" would not "give rise to an Eighth Amendment violation." *Id.* at 41, 50. Mr. Martin alleges neither an isolated mishap, nor that Defendants' protocol *might* not be followed. Rather, Defendants have consistently and repeatedly deviated from their protocol. Defendants' failure to ensure the continuous delivery of potent, effective pentobarbital presents a substantial risk that Mr. Martin's execution will result in excruciating suffering and serious harm.

## JURISDICTION

1.    Jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

2.    Venue is appropriate in the Northern District of Georgia under 28 U.S.C § 1391(b) because at least one of the Defendants resides in this district.

## THE PARTIES

3.    Plaintiff De'Kelvin Rafael Martin is a United States citizen and resident of the State of Georgia.  He is a death-sentenced prisoner currently being held in the custody of Defendants at the Georgia Diagnostic and Classification Prison in Jackson, Georgia.

4.    Defendant Gregory Dozier is the commissioner of the Georgia Department of Corrections, which is headquartered in Atlanta, Georgia.  As commissioner, Defendant Dozier is responsible for the supervision of operations at the Georgia Department of Corrections.  He has a duty to ensure that executions are carried out in compliance with the Eighth and Fourteenth Amendments and departmental procedure.  Defendant Dozier is sued in his official capacity as commissioner of the Georgia Department of Corrections.

5.    Defendant Benjamin Ford is the warden of the Georgia Diagnostic and Classification Prison in Jackson, Georgia.  As warden, Defendant Ford is responsible for the day-to-day operations of the prison.  He also has a duty to ensure that executions are carried out in compliance with the Eighth and Fourteenth Amendments and departmental procedure.  Defendant Ford is sued in his official capacity as warden of the prison.

6.    All Defendants are being sued in their official capacities.  The Defendants are United States citizens and residents of the State of Georgia.

## PROCEDURAL HISTORY

7.      Mr. Martin was convicted and sentenced to death by the Superior Court of Fulton County in 2009.  The Georgia Supreme Court affirmed Mr. Martin's convictions and sentence of death on November 2, 2015.  *Martin v. State*, 298 Ga. 259, 779 S.E.2d 342 (2015).

8.      Mr. Martin subsequently filed a petition for *certiorari* review in the Supreme Court of the United States.  Mr. Martin's state review became complete on October 3, 2016, when the Supreme Court denied his petition for certiorari on direct appeal.  *Martin v. Georgia*, 137 S. Ct. 62 (October 3, 2016).[8]

## SUMMARY OF RELEVANT FACTS

9.      The Georgia Code prescribes that "[a]ll persons who have been convicted of a capital offense and have had imposed upon them a sentence of death shall suffer such punishment by lethal injection."  O.C.G.A. § 17-10-38(a). Georgia law anticipates and authorizes no alternative method of execution.

---

[8] Plaintiff does not believe that exhaustion is necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. 1997e, because this lawsuit does not challenge prison conditions and because there are no administrative remedies available that could provide redress for the challenged violations of his constitutional rights.  In the past, moreover, Defendants have rejected grievances concerning the state's method of execution from prisoners who have not yet received a death warrant.  Plaintiff has nevertheless attempted to exhaust remedies by filing an informal grievance on September 28, 2018.

10.     The Georgia Code defines "[l]ethal injection" as "the continuous intravenous injection of a substance or substances sufficient to cause death into the body of the person sentenced to death until such person is dead." *Id.*

11.     Georgia's current lethal injection protocol calls for a lethal injection of two syringes containing a total of five (5) grams of compounded pentobarbital (2.5 grams per syringe). *See* Ex. 1 at 5.

12.     Georgia has executed nineteen (19) persons with compounded pentobarbital under this protocol.[9]  The executions of these prisoners ranged in duration from eight (8) to twenty-seven (27) minutes. *See* Ex. 2.[10]

13.     The autopsies of fifteen (15) of those individuals reveal that each suffered a significant degree of fluid congestion in their lungs, while at least seven

---

[9] The following prisoners were executed with compounded pentobarbital: Marcus A. Wellons (June 17, 2014); Robert Wayne Holsey (December 9, 2014); Andrew Howard Brannan (January 13, 2015); Warren Lee Hill, Jr., (January 27, 2015); Kelly Renee Gissendaner (September 30, 2015); Marcus Ray Johnson (November 19, 2015); Brian Keith Terrell (December 9, 2015); Brandon Astor Jones (February 3, 2016); Travis Clinton Hittson (February 17, 2016); Joshua Daniel Bishop (March 31, 2016); Kenneth Earl Fults (April 12, 2016); Daniel Antony Lucas (April 27, 2016); John Wayne Connor (July 15, 2016);  Gregory Paul Lawler (October 19, 2016); Steven Frederick Spears (November 16, 2016); William Cary Sallie (December 6, 2016); J.W. Ledford (May 16, 2017); Carlton Michael Gary (March 15, 2018); and Robert Earl Butts (May 4, 2018).  Andrew Allen Cook (February 21, 2013) was executed pursuant to the current protocol but with five (5) grams of FDA-approved pentobarbital (Nembutal).

[10] The duration of an execution has been calculated from the initial injection of the first syringe until the prisoner is pronounced dead.

(7) experienced fulminant pulmonary edema.[11]  Declaration of Mark A. Edgar,

M.D. ("Edgar Decl.") (Ex. 3) at ¶¶ 4-5; Autopsies of Executed Georgia Prisoners

(Ex. 4).[12]  This experience would be extremely terrifying and torturous for any

prisoner who was not fully anesthetized because he had not received the full,

continuous dose of pentobarbital required by Georgia law.

## CAUSE OF ACTION

I.   **Defendants' Current Lethal Injection Protocol, as Written and as Administered, Creates a Substantial Risk That Mr. Martin Will Experience Severe Pain and Suffering, in Violation of The Eighth Amendment to the United States Constitution.**

14.    The Eighth Amendment's prohibition against cruel and unusual

punishment forbids methods of execution "when they involve torture or *a lingering

death*."  U.S. Const. Amend. VIII; *in re Kemmler*, 136 U.S. 436, 447 (1890)

(emphasis added).  The Eighth Amendment likewise prohibits those punishments

that present "a substantial risk of significant harm."  *Glossip v. Gross*, 135 S. Ct.

2726, 2737 (2015); *Baze*, 553 U.S. at 50-52.  Where an Eighth Amendment cruel-

---

[11] Dr. Edgar has been able to review the autopsies of all but five of the most recent executions: Mr. Lawler, Mr. Spears, Mr. Sallie, Mr. Ledford, and Mr. Gary.

[12] Fourteen of these reports were excerpted from records admitted into evidence during a hearing in the matter of *State v. Bell*, Superior Court of Gwinnett County, Case. No. 13B05156-7, on January 9, 2017.  The autopsy of Robert Earl Butts was obtained pursuant to a next-of-kin release.  Plaintiff intends to obtain the remaining autopsies through discovery in this proceeding.

and-unusual-punishment claim alleges the risk of future harm, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze,* 553 U.S. at 50 (quoting *Helling v. McKinney,* 509 U.S. 25, 33, 34–35 (1993)); *see also Glossip*, 135 S. Ct. at 2737.  In the lethal injection context, this standard requires an inmate to show "an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Baze*, 553 U.S. at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9 (1994)); *see also Glossip*, 135 S. Ct. at 2737.

15.     The controlling opinion in *Baze* also stated that prisoners "cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative."  *Baze*, 553 U.S. at 51.  Instead, prisoners must identify an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain."  *Id.* at 52.

16.     Mr. Martin can make each of these showings.

## A. Defendants' Persistent Maladministration of Pentobarbital Creates a Substantial Risk that Their Attempt to Execute Mr. Martin is Sure or Very Likely to Result in the Experience of Severe Pain and Suffering.

17.     Defendants' current protocol calls for a lethal injection of five (5) grams of pentobarbital.  This is "an extraordinarily high dose of pentobarbital." Declaration of David Waisel, M.D. ("Waisel Decl.") (Ex. 5) at ¶ 6.  Intravenous

drugs such as pentobarbital "have a remarkably consistent drug-specific onset that rarely varies more than thirty seconds upon reaching a functioning intravenous circulation." *Id.* at ¶ 3.  The "administration of 5 grams of pentobarbital should be more than sufficient to overcome any physiological differences—age, weight, rare genetic variations —that might diminish the efficacy of pentobarbital in a particular person." *Id.* at ¶ 4.  Accordingly, as Defendants' Protocol "is highly prescriptive, and . . . death is caused by a bolus dose of a single drug (pentobarbital), the time from the initiation of the execution to the death of the prisoner should be fairly consistent." *Id.* at ¶ 3.

18.    The "continuous intravenous injection" of five (5) grams of potent and effective pentobarbital is "sufficient to cause death" in a manner that comports with the Constitution.  O.C.G.A. § 17-10-38(a).  In fact, when properly administered in such a high-dose, pentobarbital will result in loss of consciousness, followed by a surgical plane of anesthesia, and then death within a matter of minutes.

19.    Defendants' Protocol, however, is not delivering such a dose, as evinced by their own records.  Defendants' execution logs document "a surprisingly wide range of times to effectuate death"— from eight (8) to twenty-seven (27) minutes—"that are inconsistent with the application of this uniform protocol."  Waisel Decl. at ¶ 4.  "[I]t is physiologically and pharmacologically

impossible for this dose of pentobarbital to effectuate the extent of variation in time to death seen here, unless the full five grams of fully-potent pentobarbital is not being delivered completely and consistently in a reliable, reproducible manner." *Id.* at ¶ 6.

20.     "The variation in the duration of these executions can only be explained by the State's failure to reliably deliver the full five grams of fully-potent pentobarbital to the inmate's intravenous circulation." *Id.*  Thus, a prisoner executed with Defendants' protocol faces a substantial likelihood that five grams of effective pentobarbital will not reach his body.

21.     Defendants' pattern of deviation, whether intentional or reckless, introduces a significant and substantial risk into each and every execution carried out under Defendants' current protocol.

22.     Upon information and belief, Defendants' execution protocol, including the policy as written and as administered, suffers from critical deficiencies.  These deficiencies, both individually *and* cumulatively, explain Defendants' documented history of inconsistent and flawed administration and establish that it is sure or very likely that Mr. Martin will not receive the full, continuous injection of five grams of effective pentobarbital, resulting in *a known risk* of severe pain and suffering.

13

23.     *First*, Defendants will attempt to execute Mr. Martin using a substance that purports to be Pentobarbital, but that has been mixed in secret, from unknown ingredients, by an undisclosed compounding pharmacy.  Defendants' lethal injection drugs are not subject to the FDA's drug-approval process or manufacturing standards.  These drugs, therefore, have not met the FDA's requirements for quality, potency, purity and stability.  This lack of oversight introduces a range of serious risks, including the risks of adulteration, contamination, and sub-potency.  The compounding pharmacy producing Defendants' drugs is unable to test chemicals to confirm their identity, potency, and purity, or to detect contamination.  Defendants' pharmacist, therefore, will be unable to discover if the drug is ineffective or the ingredients used are adulterated or counterfeit and may miss contaminants that would cause pain immediately upon intravenous administration.

24.     These risks are not abstract.  On March 2, 2015, Defendants botched the execution of Kelly Gissendaner.  At 10:19 p.m., long after the time scheduled for Ms. Gissendaner's execution, Defendants notified her lawyers that their lethal injection drugs were "cloudy."  Declaration of Lindsay Bennett (Ex. 6) at ¶ 2.  After some indecision, Defendants postponed the execution, as both the physician attending the execution and a pharmacist found the drugs not "appropriate for medical use."  *Id.*  Defendants' counsel insisted that there were no problems with

their supplier; "*this* batch [of drugs] just did not come out like it was supposed to." *Id.* at ¶ 7 (emphasis added).  Defendants later released "a video of one syringe of the pentobarbital sodium solution that was prepared for use at the scheduled execution of Inmate Gissendaner," which showed a solution that had congealed into large clumps that, as the syringe is rotated, sink and crash into the plunger. Affidavit of Robert Jones (Ex. 7) at ¶ 2; *see also* Video of Precipitated Lethal Injection Drug (Ex. 8).

25.    On May 4, 2018, after receiving an injection of compounded pentobarbital, Robert Butts announced that the drugs "burn[ed]."[13]  This is entirely consistent with the obvious and significant risk that compounded drugs, untested for purity or contaminants, will cause severe pain upon or shortly after injection.

26.    *Second*, Defendants rely on personnel with little or no training administering intravenous drugs.  Intravenous access is obtained by using a needle to introduce a catheter into either a peripheral vein, typically in the arm or hand, or a central vein, typically in the neck, chest, or groin.  "Although finding a vein can be difficult for medically trained people, the procedure becomes even more problematic for the untrained executioner."  Deborah W. Denno, Getting to Death:

---

[13] Rhonda Cook, *Robert Butts executed for 1996 murder. Final words: 'It burns, man',* ATLANTA JOURNAL-CONSTITUTION (May 4, 2018) (available at https://www.ajc.com/news/crime--law/georgia-supreme-court-rejects-stay-execution-for-robert-earl-butts/dip94hP3OKhskZ32Dw6Q5M/ (last visited Oct. 1, 2018).

Are Executions Constitutional?, 82 Iowa L. Rev. 319, 381 (1997). Inevitably, serious errors arise when uninformed and untrained personnel are relied upon to administer the execution procedure. Furthermore, Defendants offer no training for how personnel should respond to contingencies that may arise during the execution.

27.     Defendants' reliance on untrained personnel is exacerbated by their lack of experience. Upon information and belief, many of the personnel previously employed by Defendants to carry out executions no longer participate in judicial lethal injections, including the doctors and IV nurse.

28.     *Third*, Defendants' current protocol establishes that the administration of the compounded pentobarbital will not occur in the same room as Mr. Martin. Administration of the lethal injection drugs from a separate room prevents the most meaningful monitoring of Mr. Martin and the catheter site. This further increases the risk that untrained and inexperienced execution personnel will fail to detect any issues involving the drug administration and its continuous flow.

29.     *Fourth*, by requiring that the drugs be administered remotely, the compounded pentobarbital must travel through many feet of IV tubing before it will arrive at Mr. Martin. Upon information and belief, this will necessitate the use of multiple 72-inch extension sets of IV tubing. This unnecessarily increases the risk of leakage and / or pinching of the tubing, thereby creating a greater risk that

the prisoner will not receive the full dose of pentobarbital.  Moreover, the longer the IV tubing, the longer the injected drugs will be in contact with the walls of the tubing.  This allows resistance to play a larger role in the overall flow of the drugs and introduces significantly more variation and risk into the process.

30.     The only effective means of detecting problems with the IV is to gauge the amount of resistance in the tubing, an assessment that is made more difficult with longer IV tubing.  Additionally, lay executioners do not possess the training necessary to gauge this resistance.  This also substantially increases the likelihood of undetected IV problems.

31.     These deficiencies, individually and cumulatively, explain Defendants' longstanding pattern of maladministration and error.[14]  The fact that Defendants' protocol does not ensure the consistent and proper administration of 5 grams of potent pentobarbital during lethal injections presents a significant likelihood that Mr. Martin will be conscious and aware as his body begins to shut down.  This will result in a prolonged and painful death process, a "lingering death," held to be unconstitutional more than one-hundred years ago.

---

[14] Because of the secrecy surrounding Defendants' execution practices, Plaintiff will only be able to identify their failures in implementing the protocol— whether with the compounded drugs, the equipment and / or their personnel— following discovery in this case.  "[A]dditional information regarding the actual administration of the Protocol … would shed light on the failure or failures that are leading to the significant variations in time to death."  Waisel Decl. at ¶ 7.

32.     This substantial risk of pain is borne out by a review of the autopsies of fifteen (15) of the prisoners executed under Defendants' current protocol, which "are striking for the uniformity of findings within the lungs."  Edgar Decl. at ¶ 4. The lungs of each executed prisoner "were congested and heavy, which would be an unexpected finding in a person who died quickly."  *Id.*  These findings would typically be encountered "in a patient who had died from a slow bacterial infection or gradual cardiac failure, or otherwise suffered from labored respiration for an extended period of time."  *Id.*  "The presence of this finding in all of the autopsies suggests that the pentobarbital significantly depressed the prisoners' respiratory systems during the course of their execution."  *Id.*  "This degree of respiratory distress would be extremely painful for any prisoner who remained sensate."  *Id.*

33.     In seven (7) of these cases, "the medical examiner noted the presence of frothy fluid in the trachea and upper airways."  *Id.* at ¶ 5.[15]  This indicates that these "prisoners suffered from *fulminant* pulmonary edema, which refers to the extreme and rapid accumulation of excess fluid in the air sacs of the lungs."  *Id.* Pulmonary edema of such an extreme nature "would be characteristic of a death resulting from a Sarin gas attack."  *Id.*  Its onset would be "extremely painful and,

_____

[15] These seven executed prisoners are: Andrew Allen Cook; Andrew Howard Brannan; Kelly Renee Gissendaner; Brian Keith Terrell; Kenneth Earl Fults; Daniel Anthony Lucas; and Robert Earl Butts.

if the person were conscious, terrifying and intolerable." *Id.* Further, three additional prisoners suffered "grossly recognizable pulmonary edema," which is "a less-acute form of edema that is not marked by the presence of froth in the upper airways . . . [but] would be similarly painful and torturous." *Id.* at ¶ 6.[16]

34.     Defendants' failure to ensure the continuous and effective infusion of pentobarbital results not only in protracted executions for a specific subset of prisoners, but also increases the likelihood that a given prisoner will experience this harrowing ordeal.  Significantly, the autopsies of five of the six prisoners who experienced the most protracted executions under Defendants' current protocol record that they also suffered from severe pulmonary edema: Johnson (27 minutes); Terrell (25 minutes); Fults (19 minutes); Lucas (17 minutes); and Butts (15 minutes).[17]  For those inmates who, according to Defendants' own records, could not possibly have received the required continuous infusion of effective pentobarbital—*over 25%* of those executed under the current protocol—this prolonged experience of death would be intolerable.  Defendants' failure to ensure

---

[16] These executed prisoners are: Marcus Ray Johnson, Travis Clinton Hittson and Warren Lee Hill.

[17] Further, the autopsies reviewed were "inadequate for detecting edema in that no microscopic examination was conducted, which could have detected significant degrees of pulmonary edema not apparent to the naked eye.  It is possible, therefore, that other inmates also had some degree of pulmonary edema not captured in these records."  Edgar Decl. at ¶ 7.

the complete and consistent delivery of the pentobarbital will cause Mr. Martin to feel the torturous effects of fulminant pulmonary edema, while still masking the most obvious signs of consciousness. *See* Waisel Decl. at ¶ 8. In sum, there is a substantial risk that Mr. Martin will experience harrowing pain as his lungs fill with fluid and his organs and tissues die.

35.     Defendants' history and pattern of maladministration presents an objectively intolerable risk that Mr. Martin will suffer an excruciating and torturous death. This likelihood of serious suffering is especially intolerable where there exists alternative methods of execution, both feasible and readily implemented, which will substantially reduce, or even eliminate, those risks.

**B. The State's History of Maladministration is Particularly Egregious Given the Existence of Readily Implemented, Substantially Safer Alternative Procedures and Methods of Execution.[18]**

36.     The existence of easily implemented alternative procedures that would significantly reduce Mr. Martin's substantial risk of pain renders Defendants' current protocol constitutionally impermissible.

---

[18] In order to maintain his Eighth Amendment challenge to Georgia's method of execution, Mr. Martin is required to "identify a known and available alternative method of execution that entails a lesser risk of pain." *Glossip*, 135 S. Ct. at 2731. Although Mr. Martin has identified such alternative methods, he nevertheless objects to this perverse burden to challenging an unconstitutional method of execution. Additionally, Mr. Martin does not waive any potential claims that his rights could be violated by maladministration of these alternatives. Moreover, the requirement to identify an alternative method of execution does not apply to Mr. Martin's Fourteenth Amendment claim.

Alternative #1 – Additional Safeguards

37.     The alternatives to the Defendants' current defective protocol are straightforward and easily available.  Defendants can and should adopt the following safeguards to eliminate the substantial risks detailed *supra*.

38.     Defendants can and should require that persons with current and appropriate pharmacy and medical training and experience perform all the critical functions of the execution process.  This includes: the production, inspection, and testing of their lethal injection drugs; the mechanics of assembling the apparatus for and injecting the drugs; the setting and monitoring of intravenous catheters; the monitoring of anesthetic depth.  The protocol should require that the medical personnel who administer the lethal injection be anesthesiologists and Certified Registered Nurse Anesthetists ("CRNA").  Similarly, the executioners pushing the drugs should have adequate training in intravenous administration.

39.     Defendants can easily implement sufficient safeguards to ensure that the IV will be properly inserted and monitored.  There is simply no medical or scientific reason not to situate the injection apparatus, all injection personnel, and other necessary equipment in the same room as the condemned prisoner.  The bedside administration of a five (5) gram bolus dose of pentobarbital will reduce, or eliminate altogether, many of the most substantial deficiencies in Defendants' protocol.  First, by eliminating the need for extension sets of IV tubing, Defendants

can significantly reduce the risks of leakage or pinching of the tubing.  Second, the bedside administration of the lethal injection drugs will ensure adequate surveillance and monitoring of the IV, the catheter site, and the condemned prisoner.  It will likewise make gauging the amount of resistance in the tubing significantly easier.  Third, by eliminating the need for lengthy IV tubing, bedside administration will eliminate altogether the variation and risk introduced by the increased contact, and subsequent resistance, between the drugs and the walls of the tubing.

40.     Defendants can and should execute Mr. Martin by a lethal injection of FDA-approved, manufactured pentobarbital (Nembutal).  At least one other state, Missouri, has obtained FDA-approved pentobarbital in the recent past.[19]  The use of FDA-approved pentobarbital, and the accompanying guarantee of potent, non-contaminated drugs, would eliminate some of the most significant risks presented by Defendants' protocol and its administration.  Moreover, Georgia has one of the most protective secrecy laws in the country, O.C.G.A. § 42-5-36(d), which would shield any drug supplier from public view.  Defendants could, therefore, at

---

[19] Chris McDaniel, *Missouri Execution Drug Purchases Revealed*, BUZZFEED NEWS (January 8, 2017) (available at https://www.buzzfeednews.com/article/chrismcdaniel/missouri-execution-drug-purchases-revealed#.qtdQQ75pX) (last visited Oct. 2, 2018).

minimal cost, significantly reduce Mr. Martin's risk of pain by acquiring

substantially-safer, FDA-approved, pentobarbital.

Alternative #2 – Firing Squad

41.     Execution by use of a firing squad is plainly a "known and available"

alternative method under *Baze* and *Glossip*.  The Supreme Court has held that the

firing squad is a constitutionally permissible form of execution.  *See Wilkerson v.*

*Utah*, 99 U.S. 130, 134-35 (1879) (upholding sentence of death by firing squad);

*see also Arthur v. Dunn*, 137 S. Ct. 725 (2017) (Sotomayor, J., dissenting from

denial of *certiorari*) (recognizing that condemned inmates may "find more dignity

in an instantaneous death [by firing squad]").  Since 1976, Utah has carried out

three executions by firing squad – most recently on July 18, 2010.[20]

42.     Protocols for execution by firing squad are known and available.

Utah's technical manual, specifying the state's execution protocol in great detail, is

publicly accessible.  *See* Technical Manual of Utah Department of Corrections (Ex.

9).  For example, in Utah's most recent execution by firing squad, the inmate was

seated in a chair set up between stacked sandbags to prevent the bullets from

ricocheting.  A target was pinned over the inmate's heart.  Five shooters set up at a

distance of 21 feet from the inmate, armed with .30-caliber Winchester rifles.  One

---

[20] Kirk Johnson, *Double Murderer Executed by Firing Squad in Utah*, N.Y. TIMES, June 19, 2010, at A12.

rifle was loaded with blanks so that no one knew which officer killed the inmate. The inmate was pronounced dead two minutes after he was shot. *Id.* at ¶ 12; *see also Utah Brings Back the Firing Squad, So How Does It Work?*, ASSOCIATED PRESS, Mar. 24, 2015.

43.     Upon information and belief, Georgia could easily identify qualified personnel to carry out an execution by firing squad.  Furthermore, Georgia already has a sufficient stockpile of both the weapons and ammunition necessary to carry out an execution.

44.     Moreover, execution by firing squad is both swift and virtually painless.  If performed properly, the use of a firing squad will eliminate the substantial risk of severe pain that Defendants' current execution protocol, and its likely maladministration, presents to Mr. Martin.  Evidence and recent experience strongly suggest that "the firing squad is significantly more reliable" than lethal injection.  *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting).  Historically, the firing squad has resulted in significantly fewer "botched"[21] executions.  A recent study, which analyzed the contemporaneous news reports of all executions in the

---

[21] "Botched executions are those involving unanticipated problems or delays that caused, at least arguably, unnecessary agony for the prisoner or that reflect gross incompetence of the executioner."  Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty*, p. 5 (2014) (quotations omitted).

United States from 1900 to 2010 found that 7.12% of the 1,054 executions by

lethal injection were "botched" and *none* of the 34 executions by firing squad had

been botched.[22]  Accordingly, an execution by firing squad is a known and

available alternative method of execution that presents a substantially lower risk of

pain and suffering than Defendants' current flawed and inconsistently administered

protocol.

## II.     Defendants' Failure to Consistently Administer Their Own Written Protocol Violates Mr. Martin's Fourteenth Amendment Right to Equal Protection.

45.     Mr. Martin incorporates by reference each and every statement and

allegation set forth throughout this Complaint as if fully rewritten.

46.     A claim for relief under the Equal Protection Clause requires a

plaintiff to demonstrate that the government treated the plaintiff disparately as

compared to similarly situated persons and that such disparate treatment either

burdens a fundamental right, targets a suspect class, or has no rational basis.  *See*

*Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012).

47.     Mr. Martin has a fundamental right under the Eighth and Fourteenth

Amendments to the United States Constitution to be free from cruel and unusual

punishment.  This right is burdened when a State's execution team makes

---

[22] *Id.* at App. A, p. 177.

"[s]ignificant deviations from a protocol that protects inmates from cruel and unusual punishment." *Id.* at 1263.

48.    Defendants have consistently and materially deviated from their written execution protocol, impermissibly burdening Mr. Martin's Eighth and Fourteenth Amendment rights.

49.    Defendants' own records reveal a systematic pattern of deviation, either intentionally and/or recklessly, from their written protocol such that the protocol is applied arbitrarily to any given prisoner.  According to Defendants' execution logs, the time of death for prisoners under the current lethal injection protocol ranges from eight (8) to twenty-seven (27) minutes.  It is "physiologically and pharmacologically impossible for [5 grams] of pentobarbital to effectuate the extent of variation in time to death seen here, unless the full [dose] is not being delivered completely and consistently in a reliable, reproducible manner."  Waisel Decl. at ¶ 6.  This variation "can only be explained" by Defendants' "failure to reliably deliver the full five grams of fully potent pentobarbital to the inmate's intravenous circulation."  *Id.*  Moreover, this variation "indicat[es] that the process of [the protracted] executions *must have been dissimilar* to the other executions."  *Id.* at ¶ 5 (emphasis added).

50.     Defendants' inconsistent and arbitrary application of their protocol, introducing a substantial risk of severe pain and suffering to the process, burdens Mr. Martin's rights under the Eighth and Fourteenth Amendments.

51.     Alternatively, and additionally, Defendants will treat Mr. Martin differently than other similarly situated persons (i.e. other death-sentenced prisoners), without any legitimate governmental or penological interest. Defendants' arbitrary and inconsistent implementation of—and deviation from— their written protocol will result in Mr. Martin being treated differently than other death-sentenced prisoners.  Mr. Martin will be singled out as a "class of one" who will not be afforded the equal protection of Defendants' protocol as written.

52.     Defendants' documented pattern and practice of deviations are impermissible because they lack any rational basis.  There is simply no rational reason why Defendants would consistently disregard, ignore, or otherwise not follow, their own written protocol during an execution.

53.     Defendants have likewise failed to take steps to prevent further material deviations from their written protocol in future executions.  Upon information and belief, Defendants have failed to adequately train members of the execution team about how to implement their protocol.  Defendants' have likewise failed to introduce additional, meaningful safeguards that would prevent Defendants' flawed and arbitrary administration.  Defendants' failure to take these

steps and others adds additional risk that Defendants will deviate from their protocol in Mr. Martin's execution.

54.     Defendants' policy and pattern of deviations from their written protocol burdens Mr. Martin's right to be free from cruel and unusual punishment and, moreover, constitutes disparate treatment that is not rationally related in any way to a legitimate state interest.

## CONCLUSION

Mr. Martin respectfully submits that the argument, authority, and declarations that he has proffered in and alongside this Complaint demonstrate that he can meet his burden of establishing: 1) that executing him under Defendants' current lethal injection protocol poses "a substantial risk of significant harm"; and 2) that this risk would be ameliorated by executing him with appropriate safeguards, or, alternatively, with the firing squad, which are "known and available" alternative methods of execution.  *Glossip*, 135 S. Ct. at 2737.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff De'Kelvin Rafael Martin respectfully requests that this Court:

A.     Enter a declaratory judgment that Defendants' current lethal injection protocol, as written and as administered, violates Mr. Martin's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

B.      Grant injunctive relief to enjoin the Defendants from proceeding with the execution of Mr. Martin under the current lethal injection protocol, and as currently administered, which will cause Mr. Martin excruciating pain and suffering, in violation of the Eighth Amendment.

C.      Grant any further relief as it deems just and proper.

This, the 3rd day of October, 2018.

Respectfully submitted,

*/s/ Gerald W. King, Jr.*
Gerald W. King, Jr. (Ga. Bar No. 140981)
Nathan Potek (Ga. Bar No. 747921)
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org
Nathan_Potek@fd.org

COUNSEL FOR MR. MARTIN

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading was served upon

counsel for Defendants via electronic mail on this, the 3rd day of October, 2018:

        Sabrina Graham
        Beth Burton
        Senior Assistant Attorneys General
        Office of the Attorney General
        40 Capital Square, SW
        Atlanta, Georgia 30334

                        <u>/s/ *Gerald W. King, Jr.*</u>
                        Gerald W. King, Jr.