## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

De'Kelvin Rafael Martin,

                Plaintiff,

                             Case No. 1:18-cv-4617-MLB

v.

Timothy Ward, Commissioner,
Georgia Department of
Corrections, and Benjamin Ford,
Warden, Georgia Diagnostic and
Classification Prison,

                Defendants.

_____/

## OPINION & ORDER

Plaintiff De'Kelvin Rafael Martin sued Defendants Gregory Dozier[1] and Benjamin Ford, challenging Georgia's death penalty protocol. (Dkts. 1; 8.)  Plaintiff now moves under Federal Rule of Civil Procedure 37(a) to compel the production of documents and information.  (Dkt. 60.)  The Court grants that relief in part and denies it in part.  Defendants request

---

[1] The Court notes Timothy Ward is the current Commissioner of the Georgia Department of Corrections.

a protective order.  (Dkt. 61.)  The Court grants that request in the manner explained below.

## I.     Background

A jury in Fulton County Superior Court convicted Plaintiff of two counts of malice murder. *Martin v. State*, 779 S.E.2d 342, 348 (Ga. 2015). After finding multiple aggravating circumstances, the jury recommended the death penalty.  *Id.*  The court accepted that recommendation and sentenced Plaintiff to death.  *Id.*  After failed direct appeals, Plaintiff instituted this action seeking declaratory and injunctive relief under Title 42, United States Code, Section 1983, claiming his execution under Georgia's death penalty protocol ("Protocol") poses a substantial and unacceptable risk that he will suffer an excruciating death in violation of his rights under the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment. (Dkt. 8.)  Plaintiff challenges the Protocol because of a documented pattern of maladministration that has led to "a surprisingly wide range of times to effectuate death . . . that are inconsistent with the application of [a] uniform protocol." (*Id.* ¶ 19.)  He contends the Protocol violates the United States Constitution because the drug Georgia uses is not sufficiently potent to kill without severe and

needless suffering or because Georgia does not properly administer it to condemned inmates.  (*Id.* ¶¶ 23, 26–29.)  The Court denied Defendants' motion to dismiss, recognizing that what the alleged deficiency is in Defendants' Protocol "may be something Plaintiff can answer through discovery."  (Dkt. 21 at 17.)

A discovery plan was then entered, and Plaintiff served Defendants with his first set of requests for production and interrogatories.  (Dkts. 39; 40; 41; 60-2; 60-3.)  After Defendants responded, counsel for both sides attempted to resolve several disputes about the proper scope of discovery, mostly involving the lethal injection drug Georgia uses and the manner in which Georgia administers it.  (Dkts. 60-6; 60-7.)  On July 2, 2020, the parties submitted to the Court a joint statement regarding discovery dispute.  (Dkt. 52.)  The Court held a telephonic conference and ordered full briefing on the dispute, requesting the parties focus on *Jordan v. Commissioner, Mississippi Department of Corrections*, 947 F.3d 1322 (11th Cir. 2020), and discovery permitted under O.C.G.A. § 42-5-36(d).[2]

---

[2] O.C.G.A. § 42-5-36(d), commonly referred to as "The Secrecy Act," states
(1) As used in this subsection, the term "identifying information" means any records or information that reveals a name, residential or business address, residential or business

(Dkt. 55; July 15, 2020, Hearing Transcript at 3–4, 7.)  Plaintiff argues the Court should compel Defendants to provide additional discovery regarding: (1) the "provenance of [Defendants'] lethal injection drugs . . . as well as any testing of those drugs and oversight of the facilities" that produce the drugs; (2) information "concerning the specific equipment used in prior executions"; (3) "whether the individuals administering the Protocol have the qualifications and training to do so competently"; and (4) Georgia's efforts to obtain FDA approved alternative drugs for use in executions.   (Dkt. 60 at 9–11; 17.)

## II.   Motion to Compel

### A.    Standard of Review

"The law's basic presumption is that the public is entitled to every person's evidence." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545,

---

telephone number, day and month of birth, social security number, or professional qualifications.

(2) The identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential and shall not be subject to disclosure under Article 4 of Chapter 18 of Title 50 or under judicial process. Such information shall be classified as a confidential state secret.

1547–48 (11th Cir. 1985). "The Federal Rules of Civil Procedure strongly favor full discovery whenever possible." *Id.* at 1547. A party may thus obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."[3] Fed. R. Civ. P. 26(b)(1). "As indicated by the language of Rule 26, the relevance of information sought in discovery depends on the claims asserted in the underlying action and the legal standards that govern those claims." *Jordan*, 947 F.3d at 1329. The Eleventh Circuit has instructed that "[e]vidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1068 (11th Cir. 2014). "The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial, [and the] United States Supreme Court has said that they are to be broadly and liberally construed." *Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304

---

[3] The Court notes that it is undisputed Georgia's Secrecy Act does not confer a federal privilege. The Eleventh Circuit expressly recognized in *Jordan* that Georgia's Secrecy Act does not "create[] a new federal evidentiary privilege." 947 F.3d at 1340.

(5th Cir. 1973).[4] "The trial court, however, is given wide discretion in setting the limits of discovery, and its judgement will be overturned only when a clearly erroneous principle of law is applied or no evidence rationally supports the decision." *Aycock*, 769 F.3d at 1068 (internal citation omitted).

If one party does not comply with discovery requests, the opposing party may seek a motion to compel. Fed. R. Civ. P. 37(a)(1). The movant must include in its motion a certification that it made a good-faith effort to confer with the non-complying party before filing the motion. *Id.*; LR 37.1(A)(1), NDGa. "[A] district court is allowed 'a range of choice' " in deciding whether to grant or deny a motion to compel discovery responses. *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006) (quoting *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989)). If the Court finds that one or both parties faltered in their discovery obligations, it has discretion, under Rule 37(a), to compel appropriate discovery responses. Fed. R. Civ. P. 37(a)(1); *see Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 731 (11th Cir. 1984) ("Case law states that

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

a motion to compel discovery is committed to the discretion of the trial court . . . .").

A "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "The party resisting discovery bears the burden of showing 'specifically how the objected-to request is unreasonable or otherwise unduly burdensome.'" *Rhodes v. JLG Indus., Inc.*, No. 1:13-cv-0872, 2015 WL 11199066, at *2 (N.D. Ga. Apr. 30, 2015). Rule 26 objections must be sufficiently specific and involve more than a mere conclusory "recitation of expense and burdensomeness." *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985). "While Rule 26(c) articulates a single standard for ruling on a protective order motion, that of 'good cause,' the federal courts have superimposed a somewhat more demanding balancing of interests approach to the Rule." *Farnsworth*, 758 F.2d at 1547. To determine whether the good cause requirement is satisfied, a court must balance "the party's interest in obtaining access against the other party's interest in keeping the information confidential." *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001).

**B.   Discussion**

The dispute here raises two issues—whether the information Plaintiff seeks is relevant to his claims and, if so, whether disclosure of the information will subject Defendants to an undue burden that outweighs Plaintiff's right to this discovery.

**1.   Relevance**

Rule 26 says Plaintiff's claims establish the scope of relevant discovery.  Plaintiff asserts Eighth and Fourteenth Amendment claims. To prevail on his Eighth Amendment claim, Plaintiff must (1) "establish that [Defendants'] method [of execution] presents a risk that is 'sure or very likely to cause serious illness and needless suffering' " and (2) "identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.' " *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 50, 52 (2008)).  Plaintiff's Eighth Amendment claim is grounded in the "significant variation in how long it has taken the subjects of Georgia's current protocol to succumb[,] show[ing] that there is something wrong with the state's administration of pentobarbital during executions." (Dkt. 21 at 11.)  To establish his Fourteenth Amendment claim, Plaintiff

must show, among other things, "[s]ignificant deviations from a protocol that protects inmates from cruel and unusual punishment." *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012).

At the heart of Plaintiff's claims are his allegations that (1) Georgia's current lethal injection Protocol calls for the injection of five grams of pentobarbital, (2) anyone receiving such a dose should lose consciousness and die within a matter of moments, (3) since Georgia can no longer obtain pentobarbital from the manufacturer, the state obtains it from a compounding pharmacy, (4) the nineteen people executed under the current Protocol remained alive from eight to twenty-seven minutes after receiving the supposedly lethal injection, and (5) autopsies showed fifteen of them experienced a significant degree of fluid congestion in their lungs which is inconsistent with a quick, painless death by lethal injection. (Dkt. 8 ¶¶ 11–13, 18, 23, 32.) Plaintiff also notes that seven prisoners suffered pulmonary edema, a rapid accumulation of excess fluid in the lungs, to such an extent that their autopsy reports are consistent with death resulting from a Sarin gas attack. (Dkts. 8 ¶ 33; 1-4 at 95.) The onset of that condition would be "extremely painful,"

"terrifying," and "intolerable" to any condemned person who remained conscious.  (Dkts. 8 ¶ 33; 1-4 at 95.)

From all of this, Plaintiff says prior executions show Georgia does not properly administer five grams of "potent pentobarbital" which presents a "significant likelihood" he will be "conscious and aware as his body begins to shut down," "suffer a lingering death," and "feel the tortuous effects of fulminant pulmonary edema." (Dkt. 8 ¶¶ 31–34.) He alleges Defendants' method of executing him does not operate as intended and instead presents a risk that is "sure or very likely" to cause him "serious illness and needless suffering."  (*Id.* ¶ 22.)  He further alleges that it constitutes a significant deviation from a protocol that was intended to protect him from cruel and unusual punishment.  (*Id.* ¶¶ 47–50.)  Plaintiff's complaint alleges several deficiencies in the Protocol that cause it not to work as intended (that is, to avoid a sure or very likely serious illness or needless suffering): (1) the compounded phenobarbital used in the lethal injection Protocol is not potent enough to cause death as intended; (2) the equipment used to deliver the drugs is not sufficient to administer a lethal dose properly; and (3) the personnel involved in the execution are not adequately trained to carry out the Protocol as

intended.  (*Id.* ¶¶ 22–31.)  He thus seeks discovery regarding each of these items, as well as Georgia's efforts to obtain an FDA-approved alternative to compounded pentobarbital.

Defendants respond to Plaintiff's relevancy argument with the general contention that "[a] great deal of information regarding Georgia's method of execution is publicly available" and Plaintiff does not need any more information to pursue his Eighth Amendment claim.[5]  (Dkt. 61 at 26, 29.)  Public availability of information, however, has little to do with relevancy.  To prevail on his Fourteenth Amendment claim, Plaintiff must show Defendants' precise deviation from the Protocol.  And to prevail on his Eighth Amendment claim, Plaintiff must prove which deficiency poses a substantial risk of serious harm and that his proposed alternative significantly reduces that risk.  In order to do this, he must be permitted to discover information about the Protocol and how it works.  Rule 26 does not limit him to items in the public domain.

---

[5] The Court notes that Defendants raised relevance objections to all the interrogatories at issue in Plaintiff's motion, but only three of the sixteen document requests at issue.  "Generally, when a party fails to timely and properly object to a discovery request, such objections are waived."  *In re Capital One Bank Credit Card Interest Rate Litig.*, 286 F.R.D. 676, 680 (N.D. Ga. 2012).  The Court, however, addresses relevancy to fully balance the rights of each party.

Regarding the provenance of Georgia's lethal injection drug, Plaintiff seeks information about the pharmacy or pharmacies that compound the drug, how they manufactured it, details about the inspection, supervision, oversight or quality control of any facility involved in manufacturing or producing the drug, and how the drug is transported or stored prior to use.  (Dkts. 60-4 at 9, 32; 60-5 at 14–15.)  Plaintiff argues information about Defendants' compounded pentobarbital and its supplier is essential to assessing whether the drug is, in fact, what the Protocol assumes it is (adequately potent pentobarbital) and whether it has and will function as intended (by administering death without excessive and needless suffering).  (Dkt. 60 at 17.)  He also seeks information about Defendants' efforts to obtain FDA-approved drugs, arguing this is relevant to his allegation Georgia could readily obtain and use such an FDA-approved pentobarbital (Nembutal) as an alternative that would significantly reduce his substantial risk of pain, suffering, and injury.  (Dkt. 8 ¶ 40.)

Plaintiff's relevancy argument is supported by significant litigation throughout the country about the efficacy of drugs used for lethal injections.  *See Jordan*, 947 F.3d at 1338–39 (citing litigation in other

circuits concerning disclosure of confidential information about states' sourcing for lethal injection drugs); *McGehee v. Tex. Dep't of Criminal Justice*, No. H-18-1546, 2018 WL 3996956 (S.D. Tex. Aug. 21, 2018) ("By the beginning of this century, every jurisdiction that imposes the death penalty had established lethal injection as a method, if not the only method, of execution.  Lawsuits across the country have since challenged various aspects of the lethal injection process." (internal footnote omitted)).  It makes sense that, in order to assess the constitutionality of Georgia's Protocol, Plaintiff seeks information about the compounded pentobarbital at the heart of it.

Defendants cite *Jordan* in opposing Plaintiff's requests for information about the compounding pharmacies.  947 F.3d 1322.  In that case, two Mississippi death-row inmates challenged the constitutionality of Mississippi's three-drug lethal injection protocol.  During litigation, they subpoenaed the Georgia Department of Corrections for information about its source of compounded pentobarbital.  The Eleventh Circuit affirmed the district court's denial of the requested discovery, in part, because it concluded that information had little or no relevance to the inmates' Eighth Amendment claims.  It explained that information on

13

Georgia's supply and use of pentobarbital in a single-drug lethal execution protocol "obviously has no relevance to the first prong of the Eighth Amendment analysis—the risk of harm presented by Mississippi's [three-drug] method of execution." *Id.* It also found it "very questionable that the information sought by [the plaintiffs could be] relevant to even the second prong of [the plaintiffs'] Eighth Amendment claim"—that is availability of a feasible and readily implementable alternative—since "it is highly unlikely that Georgia's pentobarbital supplier w[ould] provide the drug to Mississippi if its identity [was] disclosed pursuant to the [Georgia Department of Corrections] subpoena." *Id.* Based on well-documented success anti-death penalty advocates have had pressuring pharmaceutical companies to stop supplying lethal injection drugs to states, the Court of Appeals concluded disclosure of the Georgia supplier would prevent that company from supplying the drug to Mississippi (and likely Georgia). *Id.* at 1331–33. The very discovery the Mississippi plaintiffs sought prevented the information from being relevant.

The Court found the relevance of identifying Georgia's compounded pentobarbital supplier even more tenuous given the plaintiffs' allegations

14

"describing the 'substantial risk or serious harm and severe pain' to an inmate who is subjected to a lethal injection using compounded pentobarbital." *Id.* at 1332. The Court concluded Georgia's drug was neither available nor a feasible alternative if available. *Id.*

Almost none of that rationale applies here. Plaintiff is attacking the potency of Georgia's compounded pentobarbital and seeking information about it. How it works may depend on how it was created, stored, and transported. At this point, the Court cannot say the requested information about the pharmacies that manufacture the drug, how they do so, and the procedures they follow to maintain quality control is not likely to lead to the discovery of admissible evidence. *See Shuman*, 762 F.2d at 1559 ("Rule 26 provides that the proper scope of discovery is not limited to information admissible at trial, but can also include information 'reasonably calculated to lead to the discovery of admissible evidence.' " (quoting Fed. R. Civ. P. 26(b)(1))). Plaintiff's request for information about Georgia's efforts to obtain an FDA-approved pentobarbital is also directly relevant to whether there is an available feasible alternative to the compounded product.

Defendants also argue that information about Georgia's supplier of pentobarbital has little relevance to Plaintiff's Eighth Amendment claim. (Dkt. 61 at 28.)  According to Defendants, Plaintiff already knows "that each execution has its own batch of pentobarbital compounded in the days leading up to the execution; when the pentobarbital is obtained from the pharmacist; a log of observation of the drug in the hours leading up to the execution; and when each batch is destroyed."[6] (*Id.* at 28–29.)  This argument is immaterial to relevancy.  It offers nothing as to whether the compounded drug meets the requirements of the Protocol or whether it is manufactured in a manner that is likely to lead to unnecessary pain and suffering.  Errors by a specific compounding pharmacy that mixes Defendants' lethal injection drugs are a potential reason why individuals executed under the Protocol have experienced deviations in time until death.

Defendants next argue Plaintiff does not need information about the manufacturing of the compounded pentobarbital because Plaintiff's

---

[6] Defendants also argue that, if Plaintiff is entitled to this information, then every time a batch of pentobarbital is compounded, a condemned will have the right to oversee the process. (Dkt. 61 at 29.)  This argument, however, is unrelated to relevance.

expert anesthesiologist has already concluded—based on the varying times of death in previous executions and pulmonary edemas found during subsequent autopsies—that "the dose of pentobarbital was not effective and caused the condemned inmates to suffer extreme pain and fear." (*Id.* at 29.) Defendants thus claim Plaintiff can attack the efficacy of the Georgia compounded pentobarbital without evidence from the source or sources of supply. (*Id.*) They say, therefore, the non-disclosure of the information Plaintiff seeks will not keep him from seeking redress for his claims. (*Id.* at 31.)   Of course, Defendants also allege that "in the past 23 executions, which have used compounded pentobarbital, there has been no account by any witness or any evidence from the timeline log of each execution that any of the condemned felt 'severe pain' following the injection of the compounded pentobarbital." (*Id.* at 27.)  This case certainly raises a question as to whether the compounded pentobarbital Georgia uses works as intended.   Its manufacturing, storage, transportation, and other treatment is thus relevant.  Information in the public domain informed Plaintiff's expert conclusions to support the allegations in his complaint but may be insufficient to carry Plaintiff's claims further.

Plaintiff also seeks to compel discovery of information concerning equipment used by Defendants in carrying out executions, including the identification of all equipment suppliers and the sourcing, testing, and maintenance of the equipment. (Dkts. 60-4 at 30; 60-5 at 11.) Plaintiff says this information is necessary to understand whether there is something wrong with the equipment itself or with its "assembly or arrangement." (Dkt. 60 at 17.) Plaintiff explains that Georgia's Protocol requires remote administration of the compounded pentobarbital and that this arrangement could introduce significantly more resistance and variation into the transmission of the drugs. (Dkt. 8 ¶ 29.) The Court agrees that the arrangement of the IV lines and injection system could be relevant. It is not clear, however, that Plaintiff has sought discovery of that information. The discovery requests Plaintiff cites seek only information about the sourcing, testing, and maintenance of equipment—not its arrangement. (Dkt. 60 at 6.)

Nevertheless, the Court concludes the specific equipment used in the injection system is also relevant to Plaintiff's claims, specifically as to whether the equipment is sufficient to administer the drug in the expected manner. Defendants argue that the equipment used to deliver

the fatal drug is "nothing more complicated than needles, tubing, medical tape, and syringes." (Dkt. 61 at 27.) They also argue the Protocol, which Plaintiff possesses, sets out "much of" the equipment used. (*Id.*) If that is correct, there is no dispute. But, the Court concludes information about the specific equipment (other than a heart monitor)[7] is relevant to Plaintiff's claims. Finally, Defendants contend that providing the specific manufacturers or suppliers of this equipment will do little to help Plaintiff prove the first prong of *Baze*. (*Id.* at 27–28.) That may be right. On the other hand, to the extent knowledge of the specific manufacturers or suppliers of the equipment helps specify the parameters or limitations of the equipment, that information is relevant. Defendants have not argued to the contrary.

Plaintiff finally alleges that information concerning personnel involved in executions and their training is critical in identifying the pattern of variation in the Protocol. He argues he is entitled to depose these individuals to assess potential user error. Defendants contend that

---

[7] Because the heart monitor does not administer the lethal injection drug, it is not relevant. It monitors life but is not otherwise involved in the execution. (Dkt. 60-1 at 8.) And there is no allegation a heart monitor has failed or could cause needless pain and suffering if it did.

the Protocol explains the makeup of the execution staff and Plaintiff already has been informed that the execution team trains informally throughout the year, and formally before each execution.  (*Id.* at 28.) Defendants argue that identifying the individuals involved is only marginally relevant to Plaintiff's claim.[8]  (*Id.*)  Although Plaintiff has access to the Protocol, that only explains how executions should proceed in theory.  The Protocol does not address potential user error—information Plaintiff could obtain from talking to members of the execution team or reviewing training materials.  The identity of the team members and their training is thus relevant.

### 2.    Good Cause and Undue Burden

Because the information requested is relevant, Defendants must overcome the presumption of discoverability by showing good cause for withholding the information.  *See* Fed. R. Civ. P. 26(c)(1) ("The court may, for good cause, issue an order to protect a party or person from

---

[8] Defendants contend that, if they are required to release this information, every time a member of the execution staff changes, a death row inmate will be entitled to that information.  (Dkt. 61 at 28.)  The Court notes that the possibility of death row inmates being entitled to information regarding staff changes is speculative and unrelated to relevance.

annoyance, embarrassment, oppression, or undue burden or expense."). Defendants argue there is good cause for withholding the requested information because of the undue burden it will impose on them. Both "good cause" and "undue burden" require balancing the rights of each party. *See Farnsworth*, 758 F.2d at 1547 ("While Rule 26(c) articulates a single standard for ruling on a protective order motion, that of 'good cause,' the federal courts have superimposed a somewhat more demanding balancing of interests approach to the Rule.") "Undue burden" looks at the relevancy of the information a plaintiff is seeking and the burden of disclosure on the opposing party. *Jordan*, 947 F.3d at 1337. The undue burden analysis thus requires the Court to balance the interests served by requiring production of the discovery requested (that is, the benefit to Plaintiff) against the interest furthered by preventing disclosure (that is, the burden on Defendants).

On the one hand, the information sought is relevant to Plaintiff's case. It may be his only avenue for establishing his constitutional claims or at least the avenue he wishes to pursue.

On the other hand, much has been written by other courts about fights between death row inmates—like Plaintiff—seeking discovery of

information about lethal drugs used in executions and efforts by states—like Georgia—to keep this information confidential.  Without feeling the need to rehash those extensive discussions, the Court accepts several principles as well established.  First, Georgia has a strong interest in enforcing its criminal laws, including its death penalty laws.  *See Jordan,* 947 F.3d at 1340; *see also Nelson v. Campbell*, 541 U.S. 637, 644 (2004) (calling the state's interest in implementing its death penalty laws "significant"); *In re Blodgett*, 502 U.S. 236, 239 (1992) (noting the "great weight" of a state's interest in "exercising its sovereign power to enforce the criminal law"); *cf. In re Ohio Execution Protocol Litigation*, 845 F.3d 231, 240 (6th Cir. 2016) (recognizing that Ohio has an essential interest in carrying out a lawfully imposed death sentence).

Second, requiring Georgia to disclose publicly the names of pharmacies that supply compounded pentobarbital for use in executions would burden Georgia's interest in enforcing its laws.  As recognized by the Supreme Court in *Glossip* and as discussed by the Eleventh Circuit at length in *Jordan*, recent history shows that "disclosure of the supplier for a particular drug used by a state in executions" inevitably results in anti-death penalty advocates "hound[ing] the supplier of that drug until

the supplier capitulates and ceases supplying the drug.  And without that drug or something comparable, the state's executions will necessarily cease."  *Jordan,* 947 F.3d at 1340.  That is the very reason states like Georgia have passed legislation protecting the anonymity of companies that supply drugs used in executions.  *Id.* at 1341; *see Waldrip v. Owens*, No. 1:14-CV-2119, 2014 WL 12496989, at *1 (N.D. Ga. July 8, 2014) ("One of the stated intentions of [Georgia's secrecy] law is to allow the [s]tate to obtain lethal injection drugs from manufacturers without the manufacturers having to face criticism from opponents of capital punishment, which might lead the manufacturers to refuse to provide the drugs."); *Owens v. Hill*, 758 S.E.2d 794, 805 (Ga. 2014) ("[W]ithout the confidentiality offered to execution participants by the statute, as the record and our case law show, there is a significant risk that persons and entities necessary to the execution would become unwilling to participate."); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 803 F.3d 565, 569 (11th Cir. 2015) ("To require . . . that Georgia open up about its source of pentobarbital would result in the drug becoming completely unavailable for use in executions, even though its use does not violate the Eighth Amendment.").

Third, "pharmacies view the confidentiality provided by [state secrecy laws like O.C.G.A. § 42-5-36] as a necessary shield against the 'threats, harassment, and boycotts to which other suppliers of lethal injection drugs have been subjected as a result of their lawful decision to supply state correctional departments with drugs needed to carry out executions.' " *Jordan,* 947 F.3d at 1333 (quoting *McGehee*, 2018 WL 3996956, at *9). And fourth, that same rationale provides Defendants a strong interest in protecting the identify of individuals who administer executions of the condemned.[9] *Id.* at 1337 ("When a citizen is assured via a state statute that his identity will be protected if, at some great physical and economic risk to himself, he provides a service to the state, that promise should not be lightly discarded.")

In *Jordan,* the Court weighed these considerations against the plaintiffs' need for information about Georgia's compounded

---

[9] Plaintiff argues that Defendants' assertions about the purported risk of Georgia no longer having a supply of pentobarbital or an execution team are "speculative at best." As explained, experiences elsewhere pretermit this argument. Plaintiff also argues that before The Secrecy Act, the identities of members of the execution team were publicly available and Defendants pointed to no evidence that those individuals faced harassment or their physical safety was placed at risk. That is not the world today. If the assurance of confidentiality is abandoned, there can be little doubt Defendants will struggle to find an execution team.

pentobarbital and concluded Georgia's interests in confidentiality outweighed the plaintiffs' need. But, as previously explained, the Court in *Jordan* did so after determining the information Plaintiff's sought had little to no relevance. *Id.* (describing relevance of Georgia pharmacy as "marginal to non-existent").[10] There was very little to weigh against Georgia's interest in confidentiality.

That is not the case here. As explained above, the Court has found each category of information Plaintiff seeks relevant to his constitutional claims. Plaintiff also argues that the scenarios Defendants discuss are highly unlikely since the information will not be produced to the public, but only the parties under a protective order.[11]   (Dkt. 60 at 20.) Defendants, however, contend that once the identifying information is provided, the death penalty opponents will find a way to obtain this information. (Dkt. 61 at 38.) The district court in the underlying *Jordan* case recognized this risk and explained that "the inherent danger and

---

[10] Courts in other circuits have also determined disclosure of lethal-injection-drug-supplier information would impose an undue burden on a state. *See e.g. In re Mo. Dep't Corr.*, 839 F.3d 732, 736 (8th Cir. 2016); *Ohio Execution Protocol*, 845 F.3d at 239.

[11] The Court notes Plaintiff discusses further protections he is willing to allow, including anonymous testimony and voice altering software. (Dkt. 60 at 21.)

hardship that would follow even an inadvertent disclosure convince[d] the Court that it must protect the information at issue from discovery." *Jordan v. Hall*, No. 3:15CV295, 2018 WL 1546632, at *11 (S.D. Miss. Mar. 29, 2018).  Plaintiff argues that Defendants' contention that those involved in executions will be subject to harassment or worse insinuates (1) Plaintiff's counsel will violate the protective order or (2) Plaintiff's counsel will engage in harassment.  (Dkt. 67 at 23.)  While the Court rejects that assertion, it recognizes that, even with the most stringent protective order in place, there is always a risk of an unintentional disclosure.

The Court cannot ignore the profound impact disclosure would have on Georgia's interest in enforcing its laws.  One cannot read *Jordan* without understanding that completely.  The Court, however, has the authority under Rule 26(c) to specify terms for discovery, prescribe the method, and require that confidential information only be revealed in a specified way.  *See Farnsworth*, 758 F.2d at 1548 ("Rule 26(c) gives the district court discretionary power to fashion a protective order."); *Degen v. United States*, 517 U.S. 820, 826 (1996) (noting that a district court's authority to manage discovery in civil suits includes entry of protective

orders); *Fed. Nat. Mortg. Ass'n v. Prowant*, 269 F.Supp.3d 1290, 1292 (N.D. Ga. 2015) ("Rule 26 allows a court to enter a protective order rendering documents or portions thereof unavailable to the public after a showing of good cause."). The Court concludes it can balance Plaintiff's need for some information regarding the compounded pentobarbital and the other information sought about Georgia's Protocol with Defendants' legitimate need to protect information that could jeopardize Georgia's ability to enforce its laws.

The Court thus concludes Defendants have good cause to protect from disclosure the identities of pharmacies and pharmacists who have provided compounded substances for use in Georgia's lethal injection Protocol (Interrogatory No. 5) and the identities of manufacturers, suppliers, distributers, procurement officers, and providers of substances for use in the Protocol (Interrogatory No. 4). The Court reaches the same conclusion with respect to Plaintiff's request for the identification of each person involved in the administration of Georgia's current lethal injection Protocol (Interrogatory No. 2 and Request No. 6) and the identification of every supplier and manufacturer of equipment used in Georgia's Protocol (Interrogatory No. 3). The Court's authority under

Rule 26(c) cannot save these requests. Plaintiff says he intends to depose individuals who were involved in the execution in order to bolster his claim people suffered extreme pain or a lingering death while being executed with the compounded pentobarbital. The Court is confident the parties can negotiate a manner by which Plaintiff can depose the necessary individuals, including by allowing them to testify remotely, with voice changing equipment, and without their identities being revealed. *See, e.g.*, *Moore v. Rees*, No. 06-CV-22, 2007 WL 1035013, at *15 (E.D. Ky. Mar. 30, 2007) ("Counsel for the parties can confer to reach agreement on one or more of a wide range of devices that may be employed to provide the information requested to [the plaintiff] without compromising the anonymity of execution team members."); *Ringo v. Lombardi*, No. 09-4-95-CV, 2010 WL 3310240, at *6 (W.D. Mo. Aug. 19, 2010) ("The parties have agreed to limited discovery, including anonymous depositions taken by telephone."); *Taylor v. Crawford*, 487 F.3d 1072, 1075 (8th Cir. 2007) (noting that the district court permitted a limited anonymous deposition of John Doe I, the physician in charge of mixing the chemicals and inserting the IVs for six executions). Once

Defendants work with Plaintiff to identify the necessary deponents, Plaintiff does not need their names to obtain their testimony.

The other requests can be honored without identifying critical information.  Documents concerning the compounding or mixing of pharmaceutical ingredients for use in Georgia's Protocol, including documents showing chemical properties and the process by which the compound is manufactured and the length of that process (Request No. 15), can be redacted to provide that relevant information without disclosing pharmacies and pharmacist and thus threatening Georgia's ability to enforce its laws.  This will allow Plaintiff the information he needs to assess the efficacy of the lethal injection drug without jeopardizing the disclosure of critical information.  So too, documents showing the inspection, supervision, oversight, and quality of any facility producing the lethal injection drug (Request No. 13) and documents related to the transportation and storage of pharmaceutical ingredients used in the Protocol (Request No. 14) can be redacted and produced so that Plaintiff obtains the information he seeks without jeopardizing Georgia's interests.

The same is true of the other requests at issue. With the redaction of any information that could possibly identify any entity or person involved in providing drugs, substances, or equipment used in Georgia's lethal injection Protocol as well as any individual or company involved in carrying out the Protocol, the Court concludes Defendants have not met their burden of showing good cause for the complete withholding of documents sought in Request Numbers 4, 5, 7, 11, and 12. At the same time, Plaintiff does not need the names of individuals who administer the death penalty in order to obtain relevant information about training and instructions on the administration of lethal injection drugs (Request Nos. 4, 5); the names of manufacturers to understand the equipment used and its testing and maintenance (Request No. 7); or names of potential suppliers to understand the procurement of compounded pentobarbital or efforts to procure FDA approved alternatives (Request Nos. 11, 12). Redaction of documents strikes the proper balance between the parties' respective needs.

As a some-what alternative argument, Plaintiff contends that, even if Defendants could establish good cause for withholding requested discovery under Georgia's Secrecy Act, information about the execution

30

of Andrew Cook is not protected as he was executed during the relevant time but before enactment of that Act.  (Dkt. 60 at 22.)  Defendants contend that "we must afford the statutory text its 'plain and ordinary meaning,' we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." *Deal v. Coleman*, 751 S.E.2d 337, 341 (Ga. 2013) (internal citations omitted).  They argue that nothing in the statute suggests information created before the effective date of the statute is exempted and because access to this information is a public right born from the Open Records Act, "there is no constitutional impediment to the retroactive modification of the Act by subsequent legislation." (Dkt. 61 at 12 (quoting *Deal*, 751 S.E.2d at 349).)

Whether The Secrecy Act applies retroactively is irrelevant.  The Secrecy Act does not create a federal privilege against discovery.  *Jordan*, 946 F.3d at 1340.  It might do so in state court but not in federal court. Rather than controlling discovery in this case, The Secrecy Act manifests the importance of confidentiality for companies who provide pharmaceuticals to Defendants as a necessary requirement so Georgia

31

can enforce its criminal laws, including the death penalty.   That requirement existed before passage of The Secrecy Act.   Other than the supplier's expectation of confidentiality, disclosure of information regarding Mr. Cook's execution would impose the same burden on Defendants as the disclosure of current information.   Of course, this assumes the pharmacist for the Cook execution is still an active supplier. But, even if it were not, disclosure of that supplier after termination of its relationship with Georgia would almost certainly dissuade current suppliers from supplying the State out of fear their identifies might be divulged sometime in the future upon the termination of their relationships with the State.   The Court thus refuses to treat the supplier of compounded pentobarbital for the execution of Mr. Cook any differently.

## III.   Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion to Compel (Dkt. 60).[12]   It also **GRANTS** Defendants' Request for a Protective Order (Dkt. 61) as explained herein.

---

[12] The Court notes Plaintiff states "the Court should grant this motion and compel Defendants to produce information and documents in

**SO ORDERED** this 30th day of March, 2021.


MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

response to Plaintiff's Interrogatories 1–6 and 8 and Plaintiff's Requests for Production Nos. 1–7, 11–18, and 21." (Dkts. 60 at 27–28; 67 at 24.) This language is only included in the conclusion sections of Plaintiff's motion and reply brief. Plaintiff fails to separately discuss Interrogatories 1, 6, and 8 and Requests for Production Nos. 1–3, 16–18, and 21. The parties should apply the Court's conclusions to those discovery requests.