# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

De'Kelvin Rafael Martin,

               Plaintiff,

                         Case No. 1:18-cv-4617-MLB

v.

Shawn Emmons, *Warden, Georgia Diagnostic and Classification Prison*; and Tyrone Oliver, *Commissioner, Georgia Department of Corrections*,

               Defendants.

_____/

## OPINION & ORDER

Plaintiff De'Kelvin Rafael Martin claims the State of Georgia's plan to execute him by lethal injection violates his constitutional rights. (Dkt. 8.) Defendants move for summary judgment. (Dkt. 151.)[1] The Court denies that motion.

---

[1] Defendants are Tyrone Oliver, the Commissioner of the Georgia Department of Corrections, and Shawn Emmons, the Warden at the prison where Plaintiff is incarcerated.

# I.    Background

A state jury convicted Plaintiff of two counts of malice murder (and other crimes).  *Martin v. State*, 779 S.E.2d 342, 348 (Ga. 2015).  The court imposed the death penalty.  *Id.*

## A.    Georgia's Lethal Injection Protocol

Georgia has a written protocol for executing death row inmates and plans to follow that protocol in killing Plaintiff.  (Dkt. 158-1 ¶ 18.)  The protocol includes a series of steps that prison staff, nurses, and physicians follow to execute inmates with a lethal dose of pentobarbital.  (*See* Dkt. 151-6.)  As part of this, prison officials strap a condemned inmate to a gurney in an execution chamber and medical professionals establish two lines for intravenous injections in the inmate's arms or legs.  (*Id.* at 7; Dkt. 158-1 ¶ 22.)  If they cannot do so, a physician establishes access through "central venous cannulation or other medically approved alternative."  (Dkt. 158-1 ¶ 23.)  Once access to a vein is established, three trained staff members—called an "Injection Team"—administer an initial 2.5 gram dose of pentobarbital, a second 2.5 gram dose of pentobarbital, and 60 cubic centimeters of saline to flush the IV line.

(Dkts. 151-1 ¶ 25; 151-6 at 4.)[2]  "If, after a sufficient time for death to have occurred," the inmate "exhibits visible signs of life," the Injection Team administers another five grams of pentobarbital using the same procedure.  (Dkt. 151-1 ¶ 26.)  It repeats this injection if the inmate still "shows residual signs of life within a reasonable period" of time.  (*Id.* ¶ 27.)  A physician (who the parties refer to as the lead physician) advises the warden when a heart monitor indicates the prisoner has died.  (Dkt. 151-6 at 8.)  The warden and two physicians enter the execution chamber "to determine if death has occurred."  (*Id.*)  If so, the warden announces the inmate's death.  (*Id.*)

## B.    Alleged Problems with the Protocol

The crux of Plaintiff's claim is that, under the current protocol, it has taken the State between 8 and 27 minutes from the first dose of pentobarbital to kill condemned prisoners.  (Dkt. 8 ¶ 19.)  Plaintiff contends this variation must arise from the State's failure to reliably deliver five grams of "fully-potent pentobarbital."  (*Id.* ¶ 20.)  He identifies

---

[2] In March 2013, the State changed from using a single dose of FDA-approved pentobarbital to a single dose of compounded pentobarbital.  (Dkt. 158-1 ¶ 73.)

several "deficiencies" that he says (individually or in combination with each other) could be to blame, including improper compounding by a pharmacist (resulting in the injection of ineffective or adulterated pentobarbital), improper training of personnel (resulting in ineffective intravenous access and delivery of the lethal drug), and poor design and administration of the process (also resulting in ineffective delivery of the drug). (*Id.* ¶¶ 23–29.) He also says autopsies of 15 inmates executed by Georgia revealed "congested and heavy" lungs, indicating the administration of pentobarbital caused them respiratory distress—an experience that would be painful to a prisoner who "remained sensate." (*Id.* ¶ 32.)[3]

Plaintiff alleges the protocol presents a significant likelihood he will be conscious as his body shuts down, resulting in a prolonged and painful death in violation of the Eighth Amendment prohibition against cruel and unusual punishment. (*Id.* ¶ 31.) Plaintiff also claims the varying lengths of times it has taken inmates to die proves execution officials are doing something inconsistent with each execution and thus will treat him

---

[3] Since Plaintiff filed his complaint, he says two additional autopsies (for a total of 17) have shown congested and heavy lungs. (Dkt. 162 ¶ 134.)

differently than similarly situated prisoners sentenced to death in violation of his Fourteenth Amendment right to equal protection. (*Id.* ¶¶ 49–50.)

Plaintiff proposes two alternatives to Georgia's current method of execution: either the State could use a single dose of pentobarbital with more safeguards, or it could execute Plaintiff with a firing squad. (*Id.* ¶¶ 36–44.) For relief, Plaintiff seeks a declaratory judgment that the protocol violates his rights and an order enjoining state officials from executing him under that protocol. (*Id.* at 28–29.)

## C.    Procedural History

The Court previously denied Defendants' motion to dismiss. (Dkts. 11, 21.) Defendants also previously moved for summary judgment. (Dkt. 116.) The Court denied that motion as premature. (Dkt. 140.) Discovery has now concluded, and Defendants again move for summary judgment. (Dkt. 151.)

## II.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party

moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, <u>357 F.3d 1256, 1260</u> (11th Cir. 2004). The non-moving party then has the burden of showing summary judgment is improper by coming forward with "specific facts" demonstrating a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, <u>475 U.S. 574, 587</u> (1986).[4] Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Salinero v. Johnson & Johnson*, <u>995 F.3d 959, 964</u> (11th Cir. 2021).

## III.  Discussion[5]

### A.  Universe of Facts Properly Before the Court at Summary Judgment

The Court addresses a couple of preliminary disputes that limit the record under consideration.   In moving for summary judgment,

---

[4] In its motion, Defendants argue "[Plaintiff] has . . . not proven . . . ." (<u>Dkt. 152-2 at 53</u>.) At this stage, however, Plaintiff doesn't have to prove anything. As noted, all Plaintiff must do is demonstrate a genuine issue of material fact. *Matsushita Elec. Indus. Co.*, <u>475 U.S. at 587</u>.

[5] The Court uses the parties' proposed facts and responses as follows (Dkts. 158-1, 162). When a party does not dispute an asserted fact (or

Defendants rely on deposition testimony that three witnesses gave in another case. Plaintiff objects because he was not a party to that case and had no opportunity to examine the witnesses. (Dkt. 158 at 26–28.) As shown below, the Court does not rely on that testimony (without deciding whether it could have done so).[6]

Plaintiff next challenges Defendants' reliance on a declaration and deposition testimony containing expert opinions from Dr. Jacqueline Martin, an associate medical examiner for the Georgia Bureau of Investigation. (*Id.* at 29–32; Dkt. 158-1 ¶ 130.) Plaintiff says Defendants did not disclose her as an expert witness and thus cannot rely on her opinion at summary judgment. (Dkt. 158 at 31.) Defendants respond that they only intended to use her as a fact witness, so the Court can disregard any of her testimony that "cross[] the line into expert opinion."

---

part of a fact), the Court accepts it. When a party denies an asserted fact, the Court reviews the record. If the denial lacks merit, the Court accepts the fact. If an asserted fact is immaterial or a legal conclusion, the Court excludes it. The Court sometimes modifies an asserted fact to accommodate an objection when the record supports it. The Court also draws some facts directly from the record as permitted. *See* Fed. R. Civ. P. 56(c)(3).

[6] Nothing prevents Plaintiff from renewing his request before trial.

(Dkt. 161 at 7.)  As discussed at a previous hearing, many of Dr. Martin's averments cross that line.  (Dkt. 168 at 4.)  The Court notes and disregards those portions.

Even if Defendants had properly disclosed Dr. Martin, they failed to comply with Local Rule 56.1(B) to inject much of her testimony into the record before the Court.  Under that rule, a party seeking summary judgment must include a statement of material facts that he or she claims are undisputed.  *See* LR 56.1(B)(1), NDGa.  The Court will not consider any fact "set out only in the brief and not in the movant's statement of undisputed facts."  *Id.*  Despite the clarity of this rule, Defendants cite testimony from Dr. Martin and other evidence in their brief without including those facts in their required statement.  The Court does not consider that information.[7]

---

[7] The Court likewise notes where Plaintiff has committed the same error. But the Court gives Plaintiff more leeway given the nature of this case and the potential consequences of declining to consider facts for each party.  For Defendants, any decision not to consider facts might mean Defendants proceed to trial.  For Plaintiff, on the other hand, any decision not to consider facts might mean Plaintiff loses his case, and Defendants proceed with his execution.  So the Court exercises its discretion to consider (limited) facts Plaintiff raised in his response brief but not in his statement of material facts.

## B.    Eighth Amendment Claim

To challenge a state's lethal injection protocol under the Eighth Amendment, a prisoner must show the protocol creates "a substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008). That is, the method must present a risk that is "sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers." *Id.* (emphasis and quotation marks omitted). The prisoner must also identify an alternative procedure that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* at 52. "If a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as cruel and unusual under the Eighth Amendment." *Id.* Notably, "the Eighth Amendment does not guarantee a prisoner a painless death," but instead forbids punishment that intensifies the sentence of death with a cruel

superaddition of "terror, pain, or disgrace." *Bucklew v. Precythe*, 587 U.S. 119, 132 (2019).

### 1.    Substantial Risk of Serious Harm

Georgia has executed 24 inmates under the protocol. (Dkt. 151-15.) The parties agree each of these inmates died from an overdose of pentobarbital. (Dkts. 152-2 at 35–41; 168 at 16.) Defendants move for summary judgment, saying no evidence shows the protocol presents a risk that is "sure or very likely" to cause serious illness and needless suffering. (Dkt. 152-2 at 35–52.) Plaintiff responds, saying problems with the protocol—including the way Georgia obtains, stores, and administers pentobarbital—provide evidence from which a factfinder could determine he is sure or very likely to suffer the terrifying sensation of suffocating while conscious if executed by Georgia. (Dkt. 158 at 33–46.) Plaintiff also says evidence from Georgia's past executions—including the time it has taken inmates to die, autopsy findings, and eye-witness accounts—would permit a jury to reach the same conclusion. (*Id.* at 46–58.) The Court discusses each argument in turn.

### a)    Problems with Compounding & Storing Pentobarbital

Defendants argue no evidence suggests its efforts to acquire and store pentobarbital "has caused an unconstitutional level of pain in the past" or is likely to do so in the future.  (Dkt. 152-2 at 37.)  Plaintiff disagrees and says the anonymous compounding pharmacist who supplies pentobarbital to Defendants fails to follow basic principles of compounding and storage that might affect the efficacy of the drug and cause him to suffer before dying.  (Dkt. 158 at 33–40.)  In support, Plaintiff relies on a report from Dr. Michaela Almgren, a clinical associate professor in pharmacology, who reviewed a deposition provided by the anonymous compounding pharmacist and raised several criticisms with the pharmacist's work.  (Dkt. 151-19.)

Dr. Almgren, for example, criticizes the compounding pharmacist's lack of familiarity with and failure to follow various standards set by the United States Pharmacopeia (USP), a reference manual that sets standards for the identity, strength, quality, and purity of medicines in the United States.  (Dkt. 151-19 ¶¶ 2, 13.)  The compounding pharmacist testified he or she was unaware of the USP chapter governing sterile compounding and the certifications for pharmacists who specialize in

sterile compounding.    (Dkt. 162 ¶¶ 21–22.)    Almgren finds the pharmacist's lack of knowledge in this regard "highly troubling as it reveals profound training failures and demonstrates a lack of competence." (Dkt. 151-19 ¶ 13.)

███████████████████████████████████████

███████████████████████████████    (Dkt. 162 ¶ 39.)  Dr. Almgren explains, however, that the USP requires testing for several other things, including sterility (to ensure the compounded drug is not contaminated by microorganisms that could lead to drug degradation) and an appropriate pH range (to ensure the drug is stable and appropriately soluble to function as intended).  (*Id.* ¶ 38; Dkt. 151-19 ¶¶ 21–22.) Almgren also insists the compounding pharmacist should test to confirm his or her pentobarbital is 92% potent, rather than the 90% target he or she currently uses.  (Dkt. 162 ¶¶ 40, 42; Dkt. 151-19 ¶ 24.) She explains a lower potency range increases the risk the drug "may not" achieve its intended therapeutic effect.  (Dkt. 162 ¶ 41.)[8]

---

[8] As part of this, Plaintiff says one of the tests Defendants produced in discovery failed when applying the correct potency range and the Compounding Pharmacist only produced 5 out of 24 potency tests, so the Court should impose an adverse presumption that the missing results

Dr. Almgren also raises concerns about how long the pharmacist believes his or her pentobarbital remains safe and effective for use, referred to as the drug's "Before Use Date." (*Id.* ¶¶ 45–46.) ███

████████████████████████████████████████████████████

███████████████████████████████████████ (*Id.* ¶ 48.)[9] Dr. Almgren says no industry standard supports this assertion and the USP requires significantly less complex compounded drugs to be used within 48 hours. (*Id.* ¶ 49; Dkt. 151-19 ¶ 42.) She opines that deviating from the Before Use Date guidelines "can result" in poor drug quality and "questionable potency." (Dkt. 162 ¶ 46.)

Dr. Almgren next criticizes the pharmacist's use of plastic disposable syringes to package, store, and deliver pentobarbital. (*Id.*

---

were unfavorable. (Dkt. 158 at 37–38.) Even if the Court were to do so, Plaintiff would still fail to create a factual dispute that the compounding process creates a substantial risk of serious harm. As noted, Dr. Almgren says a lower potency range *increases* the risk the drug *may not* achieve its intended therapeutic effect. (Dkt. 162 ¶ 41.) This is a speculative assertion that a lower potency range will do anything at all, let alone pose a risk that is "sure or very likely" to occur. *Baze*, 553 U.S. at 50.

[9] Defendants object to this fact and others on the basis that they "make an improper statement of an issue." (Dkt. 162 ¶ 45.) The Court disregards objections—like this one—where the factual statement is directly supported by the evidence.

¶¶ 56, 63–65.)  Dr. Almgren opines that plastic syringes can "potentially" react with the drug, leaching plastic components into the medication or degrading the syringe.  (*Id.* ¶ 63.)  She added that pentobarbital "can" pick up moisture from the environment when using plastic syringes since they are not airtight.  (*Id.* ¶ 64; Dkt. 151-19 ¶ 45.)  She explains that when moisture enters the syringe, it reacts with the drug, causing degradation, loss of potency, and the potential formation of precipitants and degradants. (Dkts. 162 ¶ 65; 151-19 ¶ 45.)

Apart from the way the compounding pharmacist creates and packages the lethal drug, Plaintiff also says Defendants store the drug improperly and in a manner that could cause him to suffer.  Specifically, Dr. Almgren opines that pentobarbital should be stored at room temperature and *not* refrigerated or frozen.  (Dkts. 162 ¶ 82; 151-19 ¶ 47.) Dr. Almgren explains the "[f]ailure to follow appropriate . . . storage conditions often results in a loss of potency, changes in the chemical composition, and/or contamination of compounded medications, all of which will impact the medication's safety and efficacy."  (Dkt. 151-19

¶ 46.)[10]  Plaintiff says Georgia's protocol has no guidance for storage conditions like temperature and humidity, despite the importance of proper storage for maintaining the potency and efficacy of pentobarbital. (Dkt. 162 ¶ 54.)[11]

Plaintiff insists Georgia stores its pentobarbital in a refrigerated area.  For this assertion, Plaintiff relies on evidence surrounding the failed execution of Kelly Gissendaner in 2015.  (Dkt. 158 at 42–43.) Defendants had to postpone her execution when—sometime before administering the drug—prison officials noticed the pentobarbital was "cloudy or slightly frozen."  (Dkt. 158-3 at 115.)  Defendants say the State's investigation revealed the most likely cause was shipping or storing the pentobarbital in a cold environment.  (Dkt. 152-2 at 38 n.11.)

---

[10] Plaintiff did not include this part of Almgren's report in his statement of material facts.  (Dkt. 162.)  The Court still considers it.

[11] Plaintiff contends Defendants were aware it should not refrigerate the drug at least by 2013.  (Dkt. 162 ¶ 67.)  Defendants dispute that contention.  (*Id*.)  Defendants are right.  The e-mail on which Plaintiff relies shows Defendants asked the compounding pharmacist, "the drug does NOT need to be refrigerated, correct?"  (Dkt. 158-10 at 3.)  The compounding pharmacist never responded to confirm that understanding, thus precluding Plaintiff's inference (at least on this basis).

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████    (Dkt. 162 ¶ 82.)

Defendants dispute this, arguing Plaintiff's assertion does not accurately reflect the evidence.  (*Id.*)  Defendants acknowledge the former wardens provided this testimony but insist the testimony is "inaccurate" because "Defendants affirmatively represent that[,] since the canceled execution of Kelly Gissendaner, the drugs have not been refrigerated."  (Dkt. 152-2 at 18 n.6.)  Defendants cite no authority to suggest the Court can simply disregard evidence in the record.  So the Court overrules this objection and considers the testimony that—during the time alleged—the State stored its pentobarbital in a refrigerated area.[12]

Having identified these issues, Plaintiff says Defendants' "use of expired compounded pentobarbital improperly shipped and stored in plastic" creates a "substantial likelihood of potency loss and diminished quality in the compounded pentobarbital."  (Dkt. 158 at 40.)  Plaintiff

---

[12] These facts do not help Plaintiff very much because Plaintiff cites no evidence the State currently refrigerates its pentobarbital.  And what matters is what the State will (or will not do) when it executes Plaintiff.

relies on Dr. Almgren's report for this assertion. (Dkt. 151-19 ¶ 51.)[13] The full statement from Dr. Almgren's report is as follows: "inappropriate [Before Use Date] assigned to the compound, particularly considering its recognized instability when exposed to environmental factors, coupled with selection of an improper storage container, exacerbates the risk of environmental exposure" and thus "there is a substantial likelihood of potency loss and diminished quality of the compounded pentobarbital." (*Id.*) She ultimately concludes that these considerations "highlight the substantial risk of the compounded pentobarbital failing to achieve adequate effectiveness, thus lacking the required pharmacological

---

[13] Plaintiff did not include Almgren's full report in his statement of material facts. (Dkt. 162.) The Court nevertheless considers it. In an abundance of caution, the Court also considers Dr. Almgren's reference to "environmental factors" to include alleged refrigeration. The Court thus notes that, while Dr. Almgren seems to tie refrigeration problems to a loss of potency and diminished quality, Plaintiff did not make that argument in his brief. Plaintiff relied only on alleged compounding and storage issues to attack the potency and quality of Georgia's pentobarbital, discussing refrigeration afterward. (Dkt. 158 at 41–44 (reviewing evidence and asserting there is an issue of fact as to refrigerated storage without explaining relevance to Eighth Amendment claim).) In another abundance of caution (and to avoid uncertainty from Plaintiff's organization), the Court considers the full scope of Dr. Almgren's opinion.

impact and leading to unnecessary pain and suffering for the condemned individual." (*Id.* ¶ 59.)

This testimony does not present evidence from which a factfinder could conclude Plaintiff faces a substantial risk of serious harm if executed under the protocol. First, Dr. Almgren's criticisms of the State's compounding and storage process do not support her conclusion that there is a "substantial likelihood" Georgia administers a less potent or diminished drug. Dr. Almgren merely identifies *possibilities* for errors in the compounding process. She says a deviation from the Before Use Date *can* result in poor drug quality and potency and that use of plastic *can* cause the pentobarbital to pick up moisture and become less of potent. (Dkts. 162 ¶¶ 46, 64–65; 151-19 ¶ 45.) And she says failure to properly store it "often" results in loss of potency. (Dkt. 151-19 ¶ 46.)

Somehow—from those speculative premises of what can happen—she opines that "there is a substantial likelihood" of potency loss and diminished quality in the drug here. The word "can" is "used to indicate possibility," not a probability, not a likelihood, and certainly not a substantial likelihood. "Can," Merriam-Webster's Online Dictionary 2025, https://www.merriam-webster.com/dictionary/can (last visited

July 31, 2025). And several possibilities together do not add up to a substantial likelihood. Or if they could, Dr. Almgren certainly does not explain that in her report. She simply asserts it. In the light of her detailed explanation of the possible threats from use of an expired drug and plastic syringes, Dr. Almgren's conclusory opinion of a "substantial likelihood" of an ineffective drug is insufficient to raise an issue of material fact as to whether Georgia administers an ineffective drug. *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."); *see also Evers v. General Motors*, 770 F.2d 984, 986 (11th Cir. 1985) (explaining that the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value" and cannot defeat a well-supported motion for summary judgment).

Even if Dr. Almgren's opinion could allow a factfinder to conclude Georgia's pentobarbital will likely have diminished potency and quality, she does not explain how use of that drug beyond its Before Use Date, its storage in plastic syringes, or its refrigeration are "sure or very likely" to cause an unconstitutional level of pain. All she says at the end of her

report is "[a]ll these considerations highlight the substantial risk of the
compounded pentobarbital failing to achieve adequate effectiveness, thus
lacking the required pharmacological impact and leading to unnecessary
pain and suffering for the condemned individual." (Dkt. 151-19 ¶ 59.)
She offers no basis for this conclusory assertion—no explanation of how
a less potent drug would impact a person, whether the person would be
sensate, what that person might experience, or any pharmacological
impact.  Her report offers no suggestion she even considered these things;
she just enunciates the legal standard.  And that is not sufficient to create
an issue of fact.

It seems Plaintiff recognizes Dr. Almgren's report falls short in this
regard.  So Plaintiff tries to bootstrap a conclusion about pain from his
other expert, Dr. David Waisel, onto Dr. Almgren's report.  (Dkt. 158 at
40.)  Dr. Waisel concludes "the failure to reliably deliver the full five
grams of fully-potent pentobarbital" results in a "substantial likelihood
that any prisoner executed pursuant to the [p]rotocol, including
[Plaintiff] will experience a prolonged and excruciating death."
(Dkt. 151-8 ¶ 24.)  As discussed, however, Dr. Almgren's report does not
establish a dispute about the State's failure to reliably deliver the drug

via the compounding or storage process.  So Dr. Waisel's conclusion cannot salvage Dr. Almgren's deficient report.

In conclusion, Plaintiff presents no evidence from which a factfinder could conclude the State's compounding or storage of compounded pentobarbital presents a risk "sure or very likely" to occur at all.  Nor does he present evidence of the causal connection between these risks and serious illness and needless suffering.

### b)     Problems with Administering the Drug

Defendants also say "[t]here is no dispute that Georgia's Execution Team is properly trained to carry out its lawful executions."  (Dkt. 152-2 at 46–47.)   Plaintiff disagrees, arguing ████████████████████

████████████████████████████████████████

████████████████████████████████  (Dkt. 162 ¶¶ 87–88.)[14]

Plaintiff also contends the Injection Team's training provides improper instructions about pushing the syringe; the Injection Team members

---

[14] Defendants object to these statements, arguing they are unsupported by the evidence cited. ███████████████████████████████████████████
████████████████████████████  (Dkt. 152-10 at 15.)  As Defendants have not adequately shown that the citation does not support these statements, the Court overrules the objections.

practice with an empty syringe and are thus not able to identify certain risks (like inappropriate resistance); and the Injection Team members administer the drug remotely and cannot see the prisoner or communicate with the nurses, creating a risk of leakage, pinching, or something else that prevents the inmate from receiving the full dose. (Dkt. 158 at 44–45.)[15]  Finally, Plaintiff cites Dr. Almgren's opinion that, because the Injection Team members are not medical professionals, "they do not have adequate professional experience performing . . . visual inspections" of the drug before administration.  (Dkt. 162 ¶ 92.)  Based on this, Plaintiff contends that "where there are noteworthy changes in the drug's status between inspection and administration," the Injection Team "will not be able to detect those changes." (Dkt. 158 at 46.) Plaintiff concludes by arguing that, "where the administered pentobarbital is either itself not completely effective or is delivered ineffectively . . ., the initial delivery of pentobarbital into the system would affect the prisoner's airways and lead to pulmonary edema while simultaneously

---

[15] Even though Plaintiff included none of these assertions in his statement of material facts, the Court considers them.

failing to sufficiently anesthetize the prisoner to the torturous feeling of suffocation." (*Id.* at 45–46.)[16]

From all of this, Plaintiff contends the "[I]njections [T]eam's lack of training and experience creates a substantial problem in the administration of the drugs." (*Id.* at 46.) But Plaintiff doesn't quantify this "problem" or how likely it is to occur whatsoever. He goes no further for example, by presenting evidence on the likelihood of any of these identified risks (the inability to detect noteworthy changes or problems in administration). So the assertion that someone might do any of these things is just speculation. Nothing about the Injection Team's training (or lack thereof) could allow a factfinder to conclude the pain Plaintiff says could occur from maladministration is "sure or very likely" to occur. *Baze*, 553 U.S. at 50.

###     c)     Evidence from Prior Executions

Beyond criticism of the protocol, Plaintiff argues evidence from prior executions show inmates are not receiving an effective dose of

---

[16] While Plaintiff only ties this conclusion to the Injection Team's remote administration of the drug (Dkt. 158 at 45–46), the Court considers this conclusion in the context of *all* Plaintiff's criticisms about the administration of the drug.

pentobarbital in a way that causes a (relatively) painless death but instead are suffering prolonged and agonizing deaths. (Dkt. 158 at 46–58.) In support, Plaintiff relies on what he says is a substantial variance in the time it has taken the State to kill inmates in the past, testimony from individuals who have witnessed those executions, autopsies of the executed inmates, and expert opinion from Dr. David Waisel, a practicing anesthesiologist.

In each of the last 24 executions, an administrative staff member at the prison has taken notes and recorded the timing of various events, including when the inmate is strapped to the gurney, when a nurse establishes IV access, when each injection of pentobarbital begins, and (importantly for this case) when a warden announces the inmate's death. (Dkts. 158-1 ¶ 109; 152-5 at 138; 151-4.) Dr. Waisel reviewed these timelines and opines that Georgia's execution team has experienced a "wide range of times to effectuate death[,]" ranging from 8 minutes (in the execution of J.W. Ledford) to 27 minutes (in the execution of Marcus Johnson). (Dkts. 151-8 ¶ 6; 151-15 at 2.) He calculated this range by comparing (for each inmate) the time between the first injection of pentobarbital and the time the warden announced the inmate's deaths.

(Dkts. 151-15 at 2; 151-4.)   Dr. Waisel opines that this significant variability is "inconsistent" with the administration of a high dose of pentobarbital as part of a uniform protocol.  (Dkt. 162 ¶ 122.)  He explains "it is physiologically and pharmacologically impossible" for the dose of pentobarbital that Defendants administer "to effectuate the extent of variation in time to death" in the timelines "unless the full five grams of fully-potent pentobarbital is not being delivered completely and consistently in a reliable and reproducible manner."  (*Id.* ¶ 123.)  Dr. Waisel opines that this variation "can only be explained by the State's failure to reliably deliver the full five grams of fully-potent pentobarbital."  (*Id.* ¶ 124.)  He ultimately concludes that "[b]y failing to reliably deliver the full five grams of fully-potent pentobarbital, a substantial likelihood exists that a prisoner executed under the protocol will experience a prolonged and excruciating death."  (*Id.* ¶ 133.)

Defendants contend that Dr. Waisel's calculations are wrong because he improperly used the time when the wardens announced each inmate's death as the stopping time even though the inmates were dead

before then.    (Dkt. 152-2 at 42.)[17]    Defendants say Dr. Waisel thus unnecessarily elongates the time until death.  Defendants are right.

During discovery, Plaintiff took a deposition of the State's lead physician, ████████████████████████████████████ ████████████████████████████████ (Dkts. 158-1 ¶ 29; 152-3 at 77.)

████████████████████████████████████

(*Id.*) ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████ (Dkt. 158-1 ¶¶ 116, 118.) ██████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████ (Dkts. 158-1 ¶¶ 124–25; 152-3 at 103.) ████████

████████████████████████████████████

████████████████████████████████████

---

[17] Defendants also point to Dr. Martin's observations during executions. (Dkt. 152-2 at 43–44.)  As these references contain expert opinions, the Court does not consider them.



(Dkt. 158-1 ¶ 127.)

(Dkt. 152-3 at 105.)

(*Id.*)

(Dkt. 158-1 ¶ 114.)

(Dkt. 152-3 at 76.)

(*Id.* at 78, 105.)

(*Id.* at 79.)  The warden only announces the inmate's death after all this is over.

Plaintiff insists the official time of death—when the warden makes the announcement—reflects the actual time the prisoner dies or that (at the very least) this is an issue of fact to be decided by a factfinder.  (Dkt. 158 at 49.)[18]  But, as Defendants point out,

---

[18] As part of this, Plaintiff points to Dr. Waisel's testimony that, "[i]n medicine, the official time of death is the true time of death."  (Dkt. 158 at 49.)  Plaintiff doesn't include this in his statement of facts.  In any event, as discussed above, the undisputed evidence shows the prisoners

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ (Dkts. 158-1

¶¶ 124–25; 152-3 at 103.) ████████████████████████

████████████████████████████████████████

██████████████████████ (Dkt. 152-3 at 105.)   And the

protocol itself explains that the physician notifies the warden when the

heart monitor indicates the prisoner is deceased, meaning the prisoner is

already deceased when the warden enters the execution chamber.  (Dkt.

151-6 at 8.)

Plaintiff attacks Defendants' explanation that the variation in

timing arises from delay because of the medical team's post-death,

pre-announcement discussion, saying the protocol requires the

physicians to determine the time of death "[u]pon completion of the

injection of the final syringe," not at their leisure.  (Dkt. 158 at 49.)

Plaintiff essentially contends the protocol creates a sense of urgency by

_____

were clinically deceased before the wardens announced the times of their
deaths.  Dr. Waisel's interpretation of how "official time of death" is
understood in the medical context does not undermine the actual
sequence of events established in the record here.

using the word "upon." The Court is not convinced. The protocol merely outlines a sequence of steps, not a time-sensitive directive. Nothing in this part of the protocol suggests that the physician must act urgently, by saying, for example, "immediately" or "without delay." As a result, Plaintiff cites no evidence to challenge ███████████████████████

████████████████████████████████████████████████

███████ (Dkts. 158-1 ¶ 125; 152-3 at 103.)

Correcting Dr. Waisel's misinterpretation of the timelines nullifies his opinion that the wide variation in the time it took people to die suggests the failure to deliver an effective dose of pentobarbital. And while an expert may base an opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible in evidence, "[t]heoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert . . . are [not] entitled to any weight when raised in opposition to a motion for summary judgment." *E.T. Barwick Indus. v. Walter Heller & Co.*, 692 F. Supp. 1331, 1347 (N.D. Ga. 1987) (citations omitted). The Court thus concludes Dr. Waisel's opinion about the timeline provides no evidence from which a factfinder

could conclude Defendants fail to administer an effective dose of pentobarbital.

Autopsy reports for 17 of 23 prisoners executed in Georgia since 2013 (or 78%) document the presence of a pulmonary edema or frothy fluid in the inmates' airways. (Dkt. 162 ¶ 134.)[19] Defendants argue "[t]here is no dispute that fluid build-up in the respiratory system is an expected finding with an overdose of pentobarbital." (Dkt. 152-2 at 45–46.)[20] At the hearing, the parties agreed on this point. (Dkt. 168 at 42–43.) So the issue is whether the inmates were sensate (*i.e.*, consciously felt pain) when they suffered the edema. Defendants say no evidence suggests they were. (Dkt. 152-2 at 46.) Plaintiff disagrees, insisting the autopsy reports establish this fact and further provide

---

[19] The State did not perform an autopsy on one inmate. (Dkt. 158 at 51 n.21.)

[20] Defendants point to Dr. Martin's declaration in support. (Dkt. 152-2 at 45.) As this reference contains expert opinion, the Court need not consider it. Defendants also rely on a declaration from Dr. Joseph Antognini. (*Id.*) As Defendants failed to include this evidence in their statement of material facts, the Court need not consider it either. (Dkt. 162.) Nevertheless, Defendants' errors do not matter because, as noted, Plaintiff agreed at the hearing that pulmonary edema is an expected finding with an overdose of pentobarbital.

evidence from which a factfinder could conclude he is likely to suffer the same fate.  (Dkt. 158 at 51–55.)

Plaintiff again relies on Dr. Waisel's report.  He explains that "[p]ulmonary edema generally involves a process in which fluid from the bloodstream floods the lungs making it more difficult to breathe, leading to sensations of shortness of breath similar to the experience of drowning." (Dkt. 162 ¶ 126.)  Dr. Waisel opines "with a reasonable degree of medical certainty" that the 17 prisoners suffered flash "negative pressure pulmonary edema." (Dkt. 151-8 ¶¶ 19–20.)  A negative pressure pulmonary edema is caused "where there is some upper airway obstruction" while "respiratory efforts continue, resulting in fluid seeping out of the blood vessels and into the lungs."  (Dkt. 162 ¶ 127.)  A flash edema is one that occurs quickly, like during an execution, rather than over a longer period.  (Dkt. 151-8 ¶ 19.)  According to Dr. Waisel, the onset of negative pressure pulmonary edema would be "expected to occur almost immediately following the initial IV administration of pentobarbital, as the tissues in the upper airways collapse and the vocal cords close, leading to obstructed breathing because of reduced muscle function." (Dkt. 162 ¶ 130.)  Defendants offer no evidence to dispute

these contentions, instead simply arguing that each contention "makes an improper statement of an issue." (*Id.* ¶¶ 126–127, 130.)  So the Court deems them uncontested.

Importantly, however, Dr. Waisel explains that "[a]s the prisoner's lungs filled with the fluid of pulmonary edema, they would feel the indescribable suffering and horror of suffocation *if sensate*." (Dkt. 151-8 ¶ 22 (emphasis added).)  They feel it and suffer if sensate.  He does not say, however, they are sensate.  He says the greatest risk of a prisoner being sensate—and thus experiencing the feeling of suffocation—is where the pentobarbital is not completely effective or is delivered ineffectively.  (Dkt. 162 ¶ 131.)  Tying all this together, he says he believes

> to a high degree of medical certainty that the State has done precisely that—by consistently failing to reliably deliver the full five grams of fully-potent pentobarbital—there is a substantial likelihood that any prisoner executed pursuant to the [p]rotocol, including [Plaintiff], will experience a prolonged and excruciating death.

(Dkt. 151-8 ¶ 24.)

Defendants argue "Dr. Waisel's opinion regarding when these events occurred—i.e. ante mortem—and whether they caused pain, is

based on nothing more than conjecture." (Dkt. 152-2 at 45.)[21]  The Court

agrees.   Dr. Waisel's conclusion—that a prisoner will suffer while

sensate—is  contingent  on  the  pentobarbital  being  ineffective  or

improperly delivered.  But, as discussed above, Dr. Waisel misinterprets

the execution timelines (conflating death with a warden's announcement

of death) to conclude the State either uses ineffective pentobarbital or

administers it ineffectively.  Removal of that faulty premise causes his

---

[21] Defendants submitted an expert affidavit from Joseph Antognini, an anesthesiologist, who often provides expert witness testimony in death penalty cases. (Dkt. 151-7 ¶¶ 1, 6.)  They cite his affidavit in their motion. (Dkt. 152-2 at 45.)  Dr. Antognini provides a lot of potentially relevant testimony, including a detailed explanation of how pentobarbital kills an inmate and how a pulmonary edema occurs in that situation; information suggesting edema can (and often does) occur post-mortem; and opinions that "5 grams of pentobarbital would cause profound brain depression and unconsciousness well before any lung congestion and pulmonary edema forms"; that post-mortem evidence of a pulmonary edema or froth in an inmates lungs "does not conclusively indicate that this froth was generated ante-mortem, or by conscious attempts to breathe"; and that following the administration of a lethal dose of pentobarbital an inmate become unconscious so quickly that he or she "would not feel the sensations of pain, suffocation, or air hunger." (Dkt. 151-7 ¶¶ 6–8, 16–17, 22.)   Defendants, however, included none of his statements in their statement of material facts.  So they cannot rely upon it in seeking summary judgment.  Nevertheless, the Court agrees with Defendants' assertion that Dr. Waisel's opinion—that the mere presence of pulmonary edema post-mortem indicates an inmate was sensate and suffered—is unsupported by the evidence.

opinion of pain to collapse on itself.  In other words, no factfinder could conclude from his opinion that the mere presence of pulmonary edema or frothy fluid in autopsies of previously executed inmates demonstrates a substantial risk Plaintiff will suffocate while sensate.

As a final argument, Defendants argue "there is no evidence that any of the 24 prisoners executed suffered an unconstitutional level of pain." (*Id.* at 47–50.)  In support, Defendants rely heavily on expert opinion or facts not included in their statement of material facts. (*Id.* at 47–49.)  Defendants, for example, rely on Dr. Martin's opinion that the dose of pentobarbital the State uses "would lead to [an inmate's] unconsciousness soon after administration and the offender would not have been sensate to feel the respiratory depression," that each inmate was "rendered unconscious within the first few minutes," and that they were "brain dead within minutes." (*Id.* at 47–48.)  As explained, the Court does not consider Dr. Martin's expert opinion because Defendants did not properly disclose her.

Beyond that, Defendants note that several individuals involved in the execution process testified they never witnessed or heard any reports of a prisoner in pain. (*Id.* at 47–49.)  Dr. Martin, who witnessed "over a

dozen" executions, testified she never saw a prisoner in pain during the executions she witnessed or received a report that a prisoner was awake or suffered during an execution. (Dkt. 158-1 ¶¶ 132, 141.)[22] ████

████████████████████████████████████████████████████

████████████████████████████████████████ (*Id.* ¶ 138;

Dkt. 152-3 at 30.) ████████████████████████████████

████████████████████████████████████████████████████

████ (Dkt. 152-3 at 74.) ██████████████████████████████

████████████████████████████████████ (*Id.*) ████████

████████████████████████████████████████████████████

████████████████████████ (Dkt. 158-1 ¶ 139.) ██████

████████████████████████████████████████████████████

████████████████████████████████████████ (Dkt.

152-5 at 25–26, 135.)

Plaintiff counters that other individuals involved in the execution process *have* witnessed manifestations of pain. (Dkt. 158 at 56–58.)

---

[22] In this regard, Dr. Martin serves simply as a fact witness so the Court considers her testimony.

Gerald W. King, Jr., who observed Robert Butts's execution in 2018, explained:

> Shortly after the warden left the chamber, the tubes running from the port to Mr. Butts's body began to bounce slightly. . . . After a minute or so, he grimaced and turned his head. He moaned something that I could not quite hear . . . [t]he one word I recognized was 'burns.' I thought that his voice sounded pained. . . . Mr. Butts's feet began to spasm. His mouth gaped open; he tilted his head back, and . . . his jaw press[ed] against his neck, a reaction that repeated at least once. He began to buck against the gurney, raising his back from it and straining his chest against the restraints. He then began to breathe heavily, with this chest visibly rising and falling many times."

(Dkt. 158-5 ¶¶ 10–11.) And Dr. Waisel opines that Butts's movements are "surprising" and "alarming" because, during the administration of anesthetic and sedative drugs, an individual "usually goes straight to sleep with little to no movement . . . ." (Dkt. 151-18 ¶ 12.)[23] Dr. Waisel adds, "I would certainly not expect anything resembling what Mr. King reports if the pentobarbital had been administered correctly. That is particularly true given the dose of pentobarbital administered under the [p]rotocol." (*Id.*)

---

[23] Plaintiff did not include this in his statement of material facts. (Dkt. 162.) The Court still considers it.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████    (Dkt. 152-12 at 113–115.)  Dr. Waisel believes this evidence important, inconsistent with proper execution by pentobarbital, and evidence of suffocation.  He explains that a properly administered effective does of pentobarbital "should eliminate all breathing in a minute or less"—thus making three or four minutes of snoring impossible.  (Dkt. 151-8 ¶ 27.)  He says Chatman's observations alone "demonstrate[] the inadequacy of the delivery of pentobarbital under the [p]rotocol."  (*Id.*)  He then offers the expert opinion that these prisoners were not snoring but rather were struggling to breath while slowly suffocating.  Based on his experience as an anesthesiologist, he says "it is likely that what [Chatman] refers to as 'snoring' was the sound of fluid collecting in the prisoners' airways and the back of their throats while they [were] still breathing, giving the prisoners the horrifying feeling of suffocation without being able to sit up and clear that fluid."  (*Id.*)  And at the end of his report, he ultimately concluded, "[o]n the basis of all the materials I have reviewed . . . it is my conclusion to a reasonable degree of medical

certainty that [Plaintiff] will be aware and experience the tortuous sensation of suffocation as he dies if executed under the [p]rotocol." (*Id.* ¶ 28.) From this he concludes "there is a more than substantial risk that [Plaintiff] will be sensate during his lethal injection given the high likelihood of maladministration described above." (*Id.*)

Defendants say Plaintiff's evidence "is all conjecture and does not present an issue of dispute, and certainly is not proof that these prisoners suffered an unconstitutional level of pain." (Dkt. 152-2 at 49.) For King's observations, the Court agrees. Neither King's declaration nor Dr. Waisel's opinions are detailed enough for a factfinder to conclude Butts experienced an unconstitutional level of pain. Butts's use of the word "burns" could encompass a broad spectrum of pain. Perhaps the IV site burned or perhaps it felt like his entire body was on fire. The Court has no way of knowing. And Dr. Waisel merely opines that these physical manifestations are alarming, surprising, and indicate maladministration. He does not, however, go a step further by addressing the degree of pain accompanying the burning sensation or

convulsions.[24]  In other words, while a factfinder could conclude Butts suffered some pain, a factfinder would have to guess Butts's experience was painful enough to be unconstitutional.  And "[i]nferences based on speculation and a mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (quotation marks omitted).

For Chatman's observations, on the other hand, the Court disagrees with Defendants.  Chatman said he saw all 12 prisoners snoring for three to four minutes.  Dr. Waisel opines—with certainty—the prisoners should not be breathing after one minute.  So this evidence would allow a jury to conclude *something* unexpected happened during the State's administration of compounded pentobarbital.  Dr. Waisel also

---

[24] Dr. Waisel says "[r]ecognition of the pain and suffering associated with a prisoner's difficulty breathing . . . will manifest in more extreme scenarios in the lifting or tilting of the prisoner's head and body off the gurney." (Dkt. 151-8 ¶ 26.)  It's unclear whether Dr. Waisel believes the prisoner is sensate during these movements, although his reference to "suffering" suggests as much.  In any event, Dr. Waisel doesn't elaborate on the degree of pain involved in these convulsions such that a factfinder could conclude the pain is unconstitutional.

says—based on his clinical experience—it is likely the snoring was fluid collecting in the prisoners' throats, giving them the horrifying "feeling" of suffocation.    From this, Dr. Waisel ultimately concludes to a "reasonable degree of medical certainty" that there is a "more than substantial risk" Plaintiff will be sensate during his execution and will experience conscious suffocation.    And the Eleventh Circuit recently acknowledged that "a substantial risk of conscious suffocation can create an Eighth Amendment problem regardless of the method of execution being used . . . ."  *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 898 (11th Cir. 2024).

Defendants present no evidence to contradict Dr. Waisel's opinion that the sound of snoring was suffocation (let alone place his opinion beyond consideration by the factfinder).   The closest Defendants get is the lead physician's testimony that he or she had not observed any unusual breathing patterns that might indicate a prisoner was in pain. (Dkt. 152-3 at 74.)   It's unclear whether the lead physician would have classified snoring as an unusual breathing pattern or something that indicated pain.   Indeed, Chatman thought he was observing benign snoring not suffocation.   And neither party presented evidence as to

whether the 12 prisoners who Chatman did not observe snored during their executions. So the only data before the Court is that Chatman noticed 12 out of 12 prisoners snoring. Accepting Dr. Waisel's undisputed interpretation of the snoring, the Court thus finds Dr. Waisel's report creates an issue of fact as to whether the protocol presents a risk sure or very likely to cause serious harm.

There may be some daylight between Dr. Waisel's statement that the snoring was "likely" suffocation while sensate and his subsequent conclusion that there is "more than substantial risk" Plaintiff will suffocate while sensate. Perhaps Dr. Waisel bumps up the quantum of likelihood. Still, the outcome remains the same for a few reasons. First, the Court will not reject Dr. Waisel's conclusion on such a thin read, especially given that the Court must view the evidence in the light most favorable to Plaintiff at this stage. Indeed, one definition of "likely" is "having a high probability of occurring or being true: very probable." "Likely," Merriam-Webster's Online Dictionary 2025, https://www.merriam-webster.com/dictionary/likely (last visited July 17, 2025). That might meet the "very likely" constitutional standard here.

Second, Defendants do not challenge Plaintiff's evidence in a meaningful way. They simply say Dr. Waisel's opinions are speculative and conjecture and are not proof the prisoners suffered an unconstitutional level of pain. (Dkts. 152-2 at 49; 161 at 14.) It's unclear why Defendants believe his opinions are speculative as they do not engage with Dr. Waisel's opinions in any detail. They certainly did not move to exclude Dr. Waisel's expert testimony from consideration at summary judgment under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), by which Defendants could have attacked his qualifications, methodology, reliability, or helpfulness. As a result, the Court must accept his basic opinion that snoring was sensate suffocation.

In conclusion, given the Eleventh Circuit's determination that "a substantial risk of conscious suffocation can create an Eighth Amendment problem," *Grayson*, 121 F.4th at 898, Dr. Waisel's undisputed interpretation of Chatman's observations raises an issue of fact as to whether Plaintiff's execution under the protocol will subject him to an unconstitutional level of pain and suffering. This is the only issue on which the Court denies summary judgment on the first prong of Plaintiff's Eighth Amendment claim.

### 2.    Alternative Method

As stated previously, the second prong requires a plaintiff to show there is an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Baze*, 553 U.S. at 52.    Plaintiff's first alternative method of execution proposes the adoption of substantially safer additional lethal injection safeguards. (Dkt. 8 ¶¶ 37–40.)   His proposal includes: (1) improving medical and pharmacy training at all the critical parts of the execution process (production, inspection, testing, assembly, injection, and subsequent monitoring) (*id.* ¶ 38); (2) requiring that the injectors be anesthesiologists or nurse anesthetists (*id.*); (3) bedside administration of the drug (as opposed to administration from a separate room) (*id.* ¶ 39); and (4) utilization of FDA-approved, manufactured pentobarbital (*id.* ¶ 40).

As Plaintiff points out, Defendants do not address this proposal in their brief.  (Dkt. 158 at 59.)   Even after raising the issue, Defendants merely reply that Martin's evidence of pain is speculative and that, "[i]f the analysis were to be based on this speculation, then possible pain from alleged errors in the administration of the firing squad would also have to be compared." (Dkt. 161 at 15.)  So, for this proposal, Defendants have

not carried their burden to show they are entitled to judgment as a matter of law on the second prong.[25]  The Court thus declines to address Plaintiff's second alternative method of execution (firing squad).

### C.     Fourteenth Amendment Claim

To succeed on his equal protection claim,  Plaintiff must show that the State will treat him disparately from other similarly situated persons. *See Amnesty Int'l, USA v. Battle,* <u>559 F.3d 1170, 1180</u> (11th Cir. 2009).  As discussed at the hearing, the parties agreed that Plaintiff's claims stand or fall together.  (<u>Dkt. 168 at 87</u>–89.)  So the Court likewise denies summary judgment on Plaintiff's Fourteenth Amendment claim.

## IV.   Conclusion

The Court **DENIES** Defendants' Motion for Summary Judgment (<u>Dkt. 151</u>).   The Court **DIRECTS** the Clerk to file this Order under provisional seal.  The Court **ORDERS** the parties, within fourteen (14) days from the date of this Order, to file a joint proposed redacted version

---

[25] Even if Defendants thought they established this by arguing there are no errors in the process, they certainly failed to address, for example, why FDA-approved, manufactured pentobarbital would not significantly reduce a substantial risk of severe pain.  Defendants only addressed Plaintiff's second proposal of using a firing squad. (Dkts. 152-2 at 53–59; 161 at 15–16.)

of the Order for public filing. The parties should include an accompanying brief describing the bases for the redactions.

  **SO ORDERED** this 14th day of August, 2025.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE